## WISCONSIN ALUMNI RESEARCH FOUNDATION v. GEORGE A. BREON & CO., Inc.*

No. 10612.

Circuit Court of Appeals, Eighth Circuit.

Aug. 5, 1936.

Rehearing Denied Sept. 8, 1936.

George I. Haight, of Chicago, Ill. (M. K. Hobbs and Ward Ross, both of Chicago, Ill., and R. T. Brewster, of Kansas City, Mo., on the brief), for appellant.

Delos G. Haynes, of St. Louis, Mo. (Frederick B. Wolf, of St. Louis, Mo., on the brief), for appellee.

*Writ of certiorari denied 57 S. Ct. 191, 81 L. Ed. ⸺.

Before WOODROUGH and THOMAS, Circuit Judges, and DEWEY, District Judge.

THOMAS, Circuit Judge.

This is a suit for infringement of claims 1, 4, 5, and 6 of Hart patent, No. 1,877,237, brought by Wisconsin Alumni Research Foundation, appellant, against George A. Breon & Co., Inc., appellee.

The patent covers an invention or discovery of E. B. Hart, professor of agricultural chemistry in the University of Wisconsin. The application for the patent was filed June 18, 1928, and the patent was issued September 13, 1932. It relates to a "Compound for the Prevention and Treatment of Anemia." Claim 1 of the patent expresses its purpose. It reads: "1. A therapeutic agent for use in connection with the treatment of anemia, including copper sulphate and a salt of iron combined to render effective the utilization of said salts for correcting the anemic condition of the blood."

The valuable feature of the discovery, and the thing that is claimed to be new and novel, consists in the combined or co-acting use of the salts of copper and iron to build up the hemoglobin content of the blood. The virtue of the remedy is in such combined or conjoint use of the two metals as distinguished from their additive or cumulative use; and the fact that the combination permits the utilization of the inorganic as well as the organic forms of the metals in building up the hemoglobin of the blood.

The sole issue submitted to the court below and brought here by the appeal is whether the invention had been "known or used by others in this country before his (Hart's) invention or discovery and not * * * described in any printed publication in this or any foreign country before his invention or discovery thereof for more than two years prior to his application." Infringement is admitted if the patent is valid, but its validity is denied for the one reason stated above.

Upon the trial the plaintiff rested after proof of its patent and the infringement thereof by the defendant. The defendant offered testimony to support its contention that the invention had been in use in this country and had been described in publications in foreign countries many years prior to the application and the issuance of the patent.

Before considering the testimony of the defendant, it will be helpful to note the principles of the law which must guide the court in arriving at a decision. Where, as in this case, a defendant in a patent infringement suit "assails the validity of a patent fair upon its face," he "bears a heavy burden of persuasion, and fails unless his evidence has more than a dubious preponderance." Radio Corporation v. Radio Engineering Laboratories, 293 U.S. 1, 8, 55 S.Ct. 928, 931, 79 L.Ed. 163, 168. The validity of the patent is presumed, and such presumption can only be overcome by clear and satisfactory proof. Sodemann Heat & Power Company v. Kauffman (C. C.A.8) 275 F. 593, 596. In Coffin v. Ogden, 18 Wall. (85 U.S.) 120, 124, 21 L.Ed. 821, the Supreme Court say: "The burden of proof rests upon him [the defendant], and every reasonable doubt should be resolved against him. If the thing were embryotic or inchoate; if it rested in speculation or experiment; if the process pursued for its development had failed to reach the point of consummation, it cannot avail to defeat a patent founded upon a discovery or invention which was completed, while in the other case there was only progress, however near that progress may have approximated to the end in view. The law requires not conjecture, but certainty. If the question relate to a machine, the conception must have been clothed in substantial forms which demonstrate at once its practical efficacy and utility."

Where foreign publications are relied upon, mere vague and general representations will not support a defense, but the knowledge "derived from the publication must be sufficient to enable those skilled in the art or science to understand the nature and operation of the invention, and to carry it into practical use," Seymour v. Osborne, 11 Wall. (78 U.S.) 516, 555, 20 L.Ed. 33, "without assistance from the patent which it is said to have anticipated," Midland Flour Milling Company v. Bobbitt (C.C.A.8) 70 F.(2d) 416, 418; and in case of a foreign patent, where the rule is the same as it is in respect of publications: "In order to be an anticipation of a United States patent, a foreign patent must disclose the invention in such full, clear, and exact terms as to enable any person skilled in the art to practice it without the necessity of experimentation." Donner v. Sheer Pharmacal Corporation (C.C.A.8) 64 F. (2d) 217, 220. It was said in the Bobbitt Case, supra, that if the device as disclosed

by the publication would, if produced after the patent has been issued, be an infringement, then its earlier disclosure would be an anticipation.

The invention in question and the publications relied upon by the defendant to show anticipation can be better appreciated if the character of the disease, anemia, is kept in mind. Dr. Logan Clendening, a witness for defendant, a professor of clinical medicine in the medical department of the University of Kansas, testified that "anemia" is a word used to indicate a reduction in the number of red cells in the circulating blood, or of a reduction of the chemical substance known as "hemoglobin," which is contained in those cells, or of the reduction of both the red cells and of the amount of hemoglobin. The blood is the only liquid tissue in the body. It consists of a fluid known as blood serum in which there float red cells, white cells, and platelets. Anemia is concerned only with the red cells. They are formed in the bone marrow. As they mature they are thrust into the blood stream. They contain hemoglobin, which is an iron compound, and iron is therefore necessary for blood formation. After the vitality of the red cells has been used up in the blood stream, they go to the spleen where they are destroyed. In health there is a balance between the number of cells formed in the bone marrow and the number destroyed in the spleen. When more are destroyed for any reason in a given time than are formed, the result is anemia. This situation may result from hemorrhage or from poisons. Such poisons may be generated by different infectious diseases such as pneumonia, cancer, or hookworm. Such anemias are called "secondary" because they are secondary to the accompanying disease which is supposed to cause them. Primary or pernicious anemia is due to the lack in the body of the substance which normally stimulates the bone marrow.

The theory of the patent and of the infringing product is that when the iron and copper salts are fed into the alimentary canal the iron by some means finds its way into the hemoglobin. The copper does not become any part of the blood, but its function is to actuate the iron. Unless they are combined and administered jointly the iron salt is not effective.

With this background we proceed to examine the prior publications which the defendant contends disclose and anticipate the patent. The first of these is a catalogue issued in 1924 by the Haver-Glover Laboratories, manufacturers of special veterinary preparations, biologicals, pharmaceuticals, instruments, and appliances. The catalogue contains various formulæ including copper sulphate, iron sulphate, and other ingredients claimed to be remedies for the treatment of intestinal parasitism in sheep and swine, for the treatment of coughs in horses and cattle, for the treatment of heaves in horses, of fowl cholera, and of white diarrhea in chicks. Nowhere is anemia even in animals mentioned. Dr. A. T. Kinsley, a veterinarian who testified for the defendant, said that all these diseases are associated with or that they accompany anemia. These facts do not taken together show that the catalog discloses the invention of the patent. It is of so little probative value that the trial court does not mention it in either his findings or his opinion. The burden was upon the defendant to prove that the remedy claimed to be anticipatory produced the same cure as that for which the patented remedy is a specific, not merely that it is a proper treatment for some other disease. Coffin v. Ogden, 18 Wall. (85 U.S.) 120, 124, 21 L.Ed. 821.

The remaining publications are Italian. The first is an article published in 1862 by Dr. L. Mendini on a Remedy for Amenorrhoea, that is, absence or suppression of the menses from other causes than pregnancy. The author states that he had for a number of years believed that ammoniacal copper, or copper sulphate and ammonia, was the basis of Grezzana pills, famous among the common people as a hemagogic. He had four of them analyzed by a chemist who reported that they contained iron sulphate, "and this containing copper." He thereupon "proceeded to make experiments, at first using ammoniacal copper alone, then combined with pharmaceutical iron sulphate." He then prepared two formulæ, one composed of ammoniacal copper and powdered rhubarb and the other including with the first two elements iron sulphate. He then proceeds: "With only one of these formulæ (he does not say which one) by administering only once, or by repeating it once, I obtained results for which I had many times awaited in vain when using pharmaceutical iron sulfate; that is, I produced the regular monthly function of the uterus and the disappearance of very obstinate chloritic affections." Chloritic affections are a form of anemia.

This article clearly does not teach that the combination of iron and copper is a

cure for anemia with that certainty required by law to invalidate a United States patent. It was published in 1862, and it does not appear that any scientist or doctor of medicine learned from it the virtue of the combination for such purpose. The reason is clear. The article does not disclose whether the formula containing iron was used or not. The whole article reveals that the author attributed the cure to the copper alone, for he says that he "had many times awaited in vain when using pharmaceutical iron sulfate." M. Liegeois, reviewing the works of Mendini in 1901, and apparently having before him more of his writings than are found in the publication in evidence, interprets them to mean that his cures of chlorosis were due solely to the prescription containing copper and not iron.

The next publication is a thesis by Albert Gonnet entitled a "Contribution to the Study of Copper and Its Compounds in Toxicology and Therapeutics." It is a discussion of the therapeutic value of copper sulphate found in the waters of various mineral springs in Europe. He says the iron salts contained in these waters "is too small to produce the efficient action attributed to them"; that "we must reserve a large part of their action to copper salts which these waters always contain." He then concludes:

"The small quantity of iron surely would not be sufficient to produce the results obtained, had not the copper salts added their effect, and thus it has become possible to cure old cases of syphilis and the gravest cases of anemia, by the use of Luchon water.

"We therefore maintain that the marvelous cures achieved must be attributed to the copper salts as well as to the iron; observations will prove this."

He clearly says that copper salts is a cure for anemia as well as that iron is such a cure. The statement does not, however, teach that copper and iron must be combined to achieve that result. Such an inference is not even plausible. "Mrs. A. J.," the patient referred to in the publication, was treated for anemia with copper sulphate alone, not combined with iron. This publication does not aid the defendant in sustaining the burden of proof resting upon it in any degree.

There is also in evidence the translation of an article by Dr. Liegeois published in the Journal des Practiciens in 1900, entitled "Iron, Arsenic or Copper in Chlorosis," which it is claimed teaches the principle of the patent under consideration. The doctor discusses the effect of cupric (copper) salt favorably as a treatment for the disease pointing out that the waters of the springs of Arceaux contain copper sulphate and that "chlorotic amenorrhea is conquered during one season, by daily taking of two or three liters of the waters of the springs * * *," and "these two or three liters represent 6 to 9 ten-milligrams of copper sulphate." Apparently for the purpose of showing that the result is not proof absolute of the effect of copper alone, he adds in parenthesis: "I am aware of the fact that likewise the meagre quantities of carbonate of iron and of manganese, arsenates, chloride of sodium, yielded by this water, must be taken into account."

No comment is necessary to show that the article by Dr. Liegeois does not teach the formula of the Hart patent. It does not approach it. It attempts to prove that copper sulphate alone is a remedy for one form of anemia and admits for the sake of scientific accuracy that the proof is not complete because of the presence of several other substances including iron in the spring water which effects the cure. He does not purport to claim that it is necessary to combine copper with any one of these substances for the purpose of a cure.

We shall consider the remaining foreign publications in one group, since they have been so treated by counsel for both parties, and for the further reason that it is the interpretations placed upon these publications by expert witnesses that the trial court seems to have relied upon mainly in arriving at his conclusion.

The general theme of these publications is the "Hematogenous (Blood Building) Influence of the Heavy Metals." The heavy metals referred to are copper, zinc, mercury, and manganese. The articles consist of the reports of a series of studies made by Professor Vinzenzo Cervello of the Royal University of Palermo and his pupils and associates. The first is an article by Cervello (1894) on the Influence of Copper in Anemia; the second by Guagenti (1896); the third by Cervello (1901); the fourth by Scarpinato (1895); the fifth by Mercadante (1897); and the sixth by Cervello and Barabini (1894).

The Italian scientists who wrote the articles start with the assumption that: "Medicinal iron acts directly, that is, forms part of the hemoglobin molecule." Guagen-

ti says, "I do not hesitate to class myself among those who believe that medicinal iron is absorbed"; and he asks, "Can this be true also of manganese, copper, mercury, zinc?" He answers: "These metals are not found in the normal constituents of our organism, and there is no proof that they can be substituted for iron in the hemoglobin molecule." But Cervello says: "It is found that the power of increasing the hemoglobin is not the exclusive property of iron, but apparently also of other heavy metals." In the first article referred to he says further: "The metals in which I have, up to the present, recognized the property, in common with iron, of increasing the hemoglobin count are copper, zinc, mercury, manganese." The purpose of the experiments reported was to test all these metals therapeutically to determine whether or not they had the property "in common with iron" of increasing the hemoglobin count. The whole purpose was to arrive at the separate effects of heavy metals and not at the effects of any combination of them. Dr. Logan Clendening, an expert testifying for the defendant, after studying these publications, testified: "As I understand it the purpose of the research was to attempt to exclude iron from being exhibited in the body. He (Cervello) says that with giving copper alone the action of the body would be exposed to iron, so he is attempting to see if copper alone will work by attempting to exclude it (iron) from the diet." The results obtained in each case were compared with the accepted belief that iron, being a constituent of hemoglobin, could be administered alone as an agent of great therapeutic value in anemia. After giving a detailed report of experiments with copper alone, Cervello says: "Copper would therefore have, in common with iron, this therapeutic indication; a comparative study of the efficacy of these two metals is reserved for a later work." He summarizes the results of his experiments in 1894 as follows:

"On the basis of my experiments copper should occupy a very high place in therapy, while heretofore, except for external application, its use as an emetic and the recent attempts in curing tuberculosis, this metal has not received important therapeutic applications.

"With reference to the other heavy metals I am not yet authorized to make definite deductions, because I have not experimented with them on man for therapeutic purposes.

"I believe, however, that zinc, so similar to copper, both from the chemical and pharmaceutical viewpoints, will be found to have almost the same hematogenous power of the latter (of copper).

"So far as mercury is concerned, it never will be practical on account of the danger of chronic poisoning. However, administered in small doses, and with the necessary precaution for avoiding possible harm, mercury also should cause a certain hemoglobin increase. I am induced to believe this, not only from my pharmacological experiments, but also from the fact that with syphilitic cases, which are subject to mercurial treatment, there is observed a noticeable improvement in general nutrition, which is certainly not due to neutralization of the syphilis and which may instead be well explained by the theory of hematogenous influence.

"Manganese has already been discussed as a substitute for iron. Hannon and Petraquin particularly believed that they noted a specific action of Mn salts in those cases of chlorosis in which there is an insufficiency or lack of this metal in the blood. The conclusions which at various times have been advanced on the therapeutic value of this metal, particularly in cases of chlorosis, are very inconsistent and I prefer to leave the question without prejudice, reserving the right to deal with it later."

Scarpinato in 1895 discussed the hematogenous power of a new copper preparation called "Cuprohemol," a combination of copper and hemol. "Hemol," he explains, is a derivative of the coloring material of the blood from crystallized hemoglobin obtained directly from solutions of ox blood. It is combined of various elements, zinc, iron, mercury, iodine, and bromine. He found that it has a "conspicuous hematogenous power on well persons as well as those afflicted with anemia." Nothing more definite is stated concerning the ingredients of cuprohemol nor of their relative amounts. Scarpinato sums up the results of his experiments, with this indefinite conclusion: "Something remains to be said relative to the mechanism through which cuprohemol acts so favorably on the hemoglobin of the blood, and it would appear primarily necessary to learn the function performed by the copper and that by the hemol. * * * At present, however, this question remains in the realm of pure hypothesis." Further, he says: "I have been able * * * to prove the reciprocal values of the prepara-

tions as proposed. for the treatment of anemia, and \* \* \* I have made a contribution to the doctrine of the hematogenous power of the heavy metals, previously formulated by Prof. Cervello."

Cervello, surveying the work done by this group of scientists, in 1901, says: "Research work done by various experimentalists, from 1894 up to this date, on human beings as well as on animals, appear to me sufficient in number to authorize me to affirm that the hematogenic power does not solely inhere to iron; the latter shares these characteristics with all heavy metals."

We have read and carefully considered the publications in evidence of the group of Italian scientists who it is claimed anticipated the patent in suit. They recognized that iron is an element of hemoglobin, and they sought to prove that other heavy metals could be substituted for it. The explanation of the authors of their difficulty in segregating copper from iron and other substances in their experiments does not teach that there is efficacy in any combination of the metals dealt with. But that is the very thing which the patent teaches. It says that "copper sulphate and a salt of iron" must be "combined to render effective the utilization of said salts for correcting the anemic condition of the blood."

Reviewing these publications, one of the experts testifying for the defendant says that he cannot find any reference to the conjoint administration of copper and iron; but, he says, "In this and other articles he (Cervello) mentions it was impossible to get rid of the iron. They (the Italians) recognize always in these articles they are giving iron at the same time, either with food or from iron stored in the body." Cervello says in one of his publications: "The metals in which I have, up to the present, recognized the property, in common with iron, of increasing the hemoglobin count are copper, zinc, mercury, manganese." This statement, the expert says, "in my opinion discloses at least one case of improvement of an anemic condition by means of the combined effects of copper and iron." The same witness was asked: "Q. Then to recapitulate, does this article (by Scarpinato) in your opinion, disclose at least one case of cure of anemic condition by means of combining the effects of the elements of copper and iron?" He answered: "Well, it is stated—I don't know whether it is so or not; he so states—it is as much of a cure as would be effected by

any copper and iron compound. I think so, yes." This same expert testified on cross-examination that he did not teach in his lecture room the effects of copper and iron on nutritional anemia until Hart's work came out. He had learned nothing from the Italian experiments.

Such expert testimony is of little value to the court. The conclusions are inconsistent with the plain statements of the authors in the publications which they purport to interpret. We are persuaded that had they not known of the patent they would not have attributed to these publications a disclosure of the combined use of the metals as a remedy. It never occurred to any of the authors of the publications in evidence that the remedy for which they were in search, namely, to increase the hemoglobin count, was to be found in some combination of inorganic iron (not alimentary) and copper in definite proportions. How, then, could their writings anticipate such a discovery made many years later?

The testimony of experts must always be weighed and considered with discrimination. Where the meaning of certain terms or the ascertainment of the ingredients of certain products presents nothing technical, expert testimony is inadmissible in explanation. United States v. Ten Cases, more or less, Bred Spred (C.C.A.8) 49 F.(2d) 87, 91; Claude Neon Electrical Products v. Brilliant Tube Sign Co. (D.C. W.D.Wash.), 40 F.(2d) 708, 717, reversed on other grounds (C.C.A.) 48 F.(2d) 176. Even where expert testimony is competent, the tribunal before which it is given is not bound to follow it, Tracy v. Commissioner of Internal Revenue (C.C.A.6) 53 F.(2d) 575, 577; and it has no probative effect when contrary to the dictates of common sense or when the expert in giving it is clearly guilty of misinterpretation, U. S. v. Spaulding, 293 U.S. 498, 507, 55 S.Ct. 273, 79 L.Ed. 617; United States v. Hill (C.C. A.8) 62 F.(2d) 1022, 1026.

The trial court indicates that great reliance was placed on the testimony of the experts. Our study of the publications convinces us that they are perfectly clear, and that the assistance of experts is wholly unnecessary to understand them. The conclusions of the experts upon the vital question at issue are not sustained by the publications themselves. Their influence, no doubt, led the trial court inadvertently into another error in considering the patent, for he says that an examination of the claims "fails to disclose any reference ci-

ther to dosage or to the proportions of the two elements in combination." The patent, however, states elsewhere than in the claims that: "A proportion of iron chloride contributing 25 mgs. of iron daily and a proportion of copper sulfate contributing 4 mgs. of copper daily is the daily dosage for an adult; for an infant, the same amount of iron but an amount of copper sulfate contributing 1 mg. of copper daily."

A consideration of the whole record is convincing that the defendant has not sustained the burden of proof cast upon it by even "a dubious preponderance" of the evidence. The publications relied upon utterly fail to "disclose the invention in such full, clear, and exact terms as to enable any person skilled in the art to practice it without the necessity of experimentation." No scientist in all the years since their publication learned the teachings of the patent from the publications in evidence; and Hart, the inventor, discovered the formula of the patent through independent and original investigations. The work of the Italian authors and Hart compared reveals a great advance in scientific knowledge and method between 1862 and 1928. Biological chemistry was "embryotic" when Cervello carried on his experiments as compared with the state of progress when Hart did his work, as shown both by their methods and achievements. One of the marked distinctions between them is that Cervello and his pupils attempted to arrive at the therapeutic effect of the several heavy metals with which they experimented by segregating and separating them from one another and considering them singly, whereas Hart combined them upon principles discovered by scientific experimentation. Another distinction most noticeable is that Cervello and his pupils started with an hypothesis and sought to demonstrate an assumed conclusion, while Hart built his formula inductively from observed facts. These and other differences between the research work reported in the publications before us and the reports of the work done by Hart and his associates disclose a striking contrast in both method and result. Had the result been the same in both instances, it might well have been said that the one anticipated the other; but, when pursuing different methods and different courses they do not arrive at the same result, it cannot properly be said that the lessons to be learned from the first teach the art of the second.

The Hart patent, we are convinced, should not be held anticipated and invalid by reason of the publications in evidence.

The judgment and decree of the trial court is reversed, and the case remanded for further proceedings not inconsistent with this opinion.

Reversed.