Robert A. COLLINS and Pigloo Corporation, an Iowa Corporation, Plaintiffs,

v.

Foster OWEN, Defendant.

Civ. No. 669.

United States District Court
N. D. Iowa,
Cedar Rapids Division.

Nov. 16, 1961.

Fred A. Ontjes, Mason City, Iowa, for plaintiffs.

Charles L. Lovercheck, Erie, Pa., for defendant.

GRAVEN, District Judge (by assignment).

The above-entitled action was heretofore tried to the Court and submitted to it. The Court, now being fully advised in the premises, makes and enters the following Findings of Fact, Conclusions of Law, and Order for Judgment.

## Findings of Fact

1. The plaintiff, Robert A. Collins, resides at Waukon, Allamakee County, Iowa. The plaintiff, Pigloo Corporation, is a corporation organized and existing under the laws of the State of Iowa with its principal place of business at Waukon, Allamakee County, Iowa. The defendant, Foster Owen, is a farmer residing near Reinbeck, Grundy County, Iowa. Allamakee County and Grundy County are in the Northern District of Iowa. In this action the plaintiffs charge the defendant with patent infringement. The infringement was allegedly committed in the Northern District of Iowa.

2. On April 3, 1956, pursuant to an application filed August 20, 1954, United States Letters Patent No. 2,740,379 for a farrowing pen was granted to the plaintiff, Robert A. Collins. On September 30, 1958, the plaintiff, Robert A. Collins, duly and legally assigned the entire interest in the patent to the plaintiff, Pigloo Corporation. Since that time, that plaintiff has been engaged in the manufacture of farrowing pens referred to as pigloos. The plaintiffs charge the defendant with infringement of the patent referred to.

3. The Patent Office references cited in the patent were the following:

No. 700,949 Klindworth May 27, 1902
No. 1,309,071 Johnson July 8, 1919
No. 2,530,485 Shannon Nov. 21, 1950

The defendant claims that those patents were prior to and anticipatory of the patent here involved. The defendant also claims that the invention which was purportedly described in that patent had been previously described in publications published in New Zealand. The defendant also asserts the defenses of file wrapper estoppel, unclean hands, and that Robert A. Collins appropriated the invention.

4. The farrowing pen described in the patent is designed for the use of one sow. It is circular in form. The outer structure consists of a side wall, roof, and

floor. Inside there is a smaller circular structure open at the top which is described as a hover. Suspended over the center is an electric heating lamp or device. The patent recites that concrete, wood, corrugated metal, or other suitable material could be used in the construction of the pen. The patent does not contain any specific dimensions. However, the evidence discloses that the pens manufactured by the plaintiff, Pigloo Corporation, are similar as to relative dimensions and features. The dimensions and features of a pen asserted by the plaintiffs to be typical of the pen described in the patent will be next described. The outer wall of the structure consists of wood panels around forty-two inches in height. The outer structure is approximately eight feet in diameter; the inner structure, or hover, is approximately three feet in diameter. There is an opening or door approximately twenty-four inches in height in the outer structure for passage by a sow. The wall of the hover is of corrugated steel and is approximately twenty-five inches in height. There is no opening into the hover on the side nearest the door. However, at the side of the hover remote from the door there is an opening grilled by two steel rods which are so spaced that the pigs may pass into the hover but the sow cannot. This constitutes a so-called creep area for the pigs. Extending around the inside wall of the outer structure from one side of the door to the other, there is a rod which is about seven inches from the wall and six inches from the floor. It is attached to the wall by inverted brackets. The space underneath the rod affords a safe creep area for the pigs. The circular hover is so offset in relation to the outer structure that the space between the hover and the rod attached to the wall of the outer structure in the vicinity of the door is so narrow that a sow cannot lie down in the space with comfort. The rod tends to guide a sow to the rear of the structure. At the rear of the structure, and opposite the grilled opening into the hover, the space provided is such that a sow can there lie down with

comfort. The floor in the open space between the outer wall of the structure and the hover slopes towards the hover, so it is more comfortable for a sow to lie with her back to the wall. Thus, a sow coming into the pen would normally be guided to and lie down opposite the grilled opening to the hover with her back to the outer wall. This would permit her pigs to readily nurse her while in the protected area afforded by the hover. The warmth given off by the electric heating lamp or device would also attract her pigs into the hover.

5. The use of an individual farrowing pen lessens the possibility of the communication of disease to the sow and pigs and has other advantages over multi-sow farrowing structures. The outer guard rail and the protected area afforded by the hover lessens the possibility of the sow lying on her pigs. The solid wall of the hover on the side facing the door into the structure lessens the exposure of the pigs to chill drafts coming in the door. The heating lamp or device in the hover provides warmth which is conducive to their survival and growth.

6. The claims of the patent are as follows:

"1. A pig brooder comprising a floor, an outer enclosure wall extending upwardly from said floor and having an entrance and exit opening formed in a part thereof and extending downwardly to the floor, said outer wall being substantially circular, and a substantially circular hover disposed within the enclosure and spaced from said outer wall and adapted to contain a litter of pigs, said hover including a segmental wall portion and a segmental section of openwork construction forming a guard portion spaced a distance from an adjacent part of said outer wall such that a sow may conveniently lie on the floor between said outer wall and the guard portion of the hover only with her back toward the outer wall and with her belly adjacent the openwork guard portion of the hover.

"2. A pig brooder as in claim 1, said hover being eccentrically disposed within the enclosure defined by said outer

wall and being disposed with its center nearer the entrance and exit opening than the part of the outer wall located opposite said wall opening, the hover being spaced from said outer wall a sufficient distance to permit a sow to readily pass through the wall opening and around the hover.

"3. A pig brooder as in claim 2, said hover wall portion being solid and being disposed adjacent the outer wall opening.

"4. A pig brooder as in claim 3, said solid hover wall portion and the openwork guard portion of the hover each being substantially of semicylindrical shape.

"5. A pig brooder as in claim 4, heating means disposed within the hover and above the hover floor, and means for suspending said heating means from above the hover.

"6. A hover as in claim 1, said floor sloping downwardly and inwardly from said outer wall to the hover, a portion of said floor, constituting the hover floor, being disposed above the level of the sloping floor portion disposed immediately therearound and below the level of the sloping floor portion disposed adjacent said outer wall.

"7. A pig brooder as in claim 6, said floor including a substantially flat portion, disposed below the level of the hover floor and extending from the hover to and through said outer wall opening, the inner lower part of said sloping floor portion being disposed at the same level or above the level of the flat floor portion.

"8. A pig brooder as in claim 7, and a guard rail extending around the sloping floor portion and disposed above and adjacent thereto and inwardly of and adjacent said outer wall.

"9. A farrowing enclosure including a floor, an upstanding substantially cylindrical wall rising from said floor and provided with an entrance and exit opening in a part thereof extending upwardly from the floor, and a cylindrical hover disposed within said enclosure eccentrically with respect to said cylindrical wall and having its center disposed nearer said wall opening than the wall portion disposed opposite to said opening, said hover including a segment of openwork construction.

"10. A farrowing enclosure as in claim 9, said hover having a solid substantially semicylindrical wall portion located adjacent said opening.

"11. A farrowing enclosure as in claim 10, said floor sloping downwardly and inwardly from said cylindrical wall toward the hover and including a hover floor portion disposed above the level of the adjacent part of the sloping floor portion and below the level of the remote part of said sloping floor portion."

7. Robert A. Collins was born and raised on a farm near Waukon, Iowa. After graduating from high school at Waukon he attended the Waukon Junior College, then Loras College at Dubuque, Iowa, and then the University of Marquette at Milwaukee, Wisconsin. His college work was primarily in liberal arts and chemistry. He was then employed as an engineer in construction work for a number of years. His last work in the construction field was as Chief Field Engineer in Charge of Construction of the Building and Chemical Separation Units for the Atomic Energy Commission at Hanford, Washington. In 1952 he returned to Waukon and commenced farming operations on a 1,200-acre farm located near that place. His farming operations included the raising of feeder pigs on an extensive scale. His feeder pig operations caused him to become much interested in the matter of housing for farrowing sows. In the winter of 1952 he commenced building farrowing houses. In the spring and summer of 1953 he gave much thought and attention to the matter of constructing a circular individual farrowing pen. In October or November, 1953, he constructed a circular individual farrowing pen similar to the pens now being manufactured by the plaintiff, Pigloo Corporation. On August 20, 1954, he applied for the patent in suit which was issued to him on April 3, 1956.

8. Prior to January 1, 1953, the Ruakura Animal Research Station in New

Zealand had been engaged in research as to farrowing pens. Mr. D. M. Smith, research officer in pig husbandry of that station, had to do with that research. The January 1, 1953, issue of the New Zealand Farmer carried an article about a circular individual farrowing pen that had been developed as a result of the research. The February 2, 1953, issue of the New Zealand Dairy Exporter carried a similar account. Both the New Zealand Farmer and the New Zealand Dairy Exporter were bona fide papers printed and published in New Zealand. The issues of those papers introduced into evidence are authentic issues of those papers. In January, 1954, Mr. D. M. Smith, the research officer referred to, was at the College of Agriculture at the University of Minnesota. Robert A. Collins came to that college in January, 1954, to consult with a Dr. Winter. Dr. Winter introduced him to Mr. D. M. Smith. Mr. Collins discussed with Mr. Smith the matter of round hog houses. Mr. Smith told Mr. Collins that he was working on a round hog house but that it was not functioning at the time.

9. Robert A. Collins commenced the manufacture of circular farrowing pens in 1955 and, up to the time of the assignment of the patent to the plaintiff, Pigloo Corporation, on September 30, 1958, had sold 228 pens. Since that time several thousand have been sold. The pens have met with commercial success.

10. In the spring of 1958, Robert A. Collins sold two of the circular pens to the Morrison Co-operative of Morrison, Iowa. Morrison is not far from the defendant's farm. The Morrison Co-operative used one of the pens as a demonstrator and then sold it to the defendant. A metal plaque had been welded onto the hover containing the following words:

"Pigloo—U. S. Patent
# 2,740,379
Serial Number 228"

After purchasing the pen the defendant built 19 pens. Those pens were substantial copies of the pen purchased. The defendant did not observe the plaque at the time he purchased the pen and at the time he built the copies. After the defendant learned that the plaintiff, Pigloo Corporation, claimed that he was infringing the patent in suit, he discontinued the use of the pens. It is well settled, however, that the fact that a party discontinues the use of an article covered by a patent before infringement suit is brought does not constitute a defense to such suit. Steinfur Patents Corporation v. William Beyer, Inc. (2d Cir. 1932), 62 F.2d 238.

11. The defendant asserts a number of defenses. He asserts, among other defenses, the defenses of file wrapper estoppel and unclean hands. The Court finds that the defendant has not established either of those defenses.

Section 102(f), 35 U.S.C.A., provides that a person shall not be entitled to a patent if "he did not himself invent the subject matter sought to be patented." The defendant asserts that if the structure which was the subject matter of the patent in suit did constitute an invention it was not invented by Mr. Collins but was conceived by Mr. Smith at the Ruakura Animal Research Station in New Zealand prior to 1953 and that Mr. Collins in his visit with Mr. Smith at the University of Minnesota in January, 1954, learned about the round hog house developed at the Ruakura Station and appropriated the invention. In that connection, the defendant stresses that the round hog house developed at the Ruakura Station and Mr. Smith's connection with it had been the subject of articles in New Zealand papers early in 1953; that round hog houses were the subject of discussion by Mr. Collins and Mr. Smith in January, 1954; and that on August 20, 1954, Mr. Collins filed his application for the patent in question. While the factual situation was such that it might be inferred that Mr. Collins did get the conception for the invention from Mr. Smith in January, 1954, the Court is of the view that the proof of the defendant will not sustain a finding that Mr. Collins knowingly appropriated the invention.

The Court finds that Mr. Collins conceived the invention in 1953.

12. The controversy in this case, in substance and reality, resolves itself into a controversy as to the validity of the patent in question because of the articles published in the New Zealand publications.

Section 102, 35 U.S.C.A., provides, in part, as follows:

"A person shall be entitled to a patent unless—

* * * * * *

"(b) the invention was * * * described in a printed publication in this or a foreign country * * * more than one year prior to the date of the application for patent in the United States * * *."

It was heretofore noted that articles describing the round hog house developed at the Ruakura Research Station appeared in the New Zealand publications in January and February, 1953, and that the application of Mr. Collins for the patent in question was not filed until August 20, 1954. The applicable rules are well and clearly stated in the case of Wisconsin Alumni Research Foundation v. George A. Breon & Co. (8th Cir. 1936), 85 F.2d 166. The United States Court of Appeals for this circuit stated (p. 167):

"* * * The validity of the patent is presumed, and such presumption can only be overcome by clear and satisfactory proof. * * *

"Where foreign publications are relied upon, mere vague and general representations will not support a defense, but the knowledge 'derived from the publication must be sufficient to enable those skilled in the art or science to understand the nature and operation of the invention, and to carry it into practical use,' Seymour v. Osborne, 11 Wall. (78 U.S.) 516, 555, 20 L.Ed. 33, 'without assistance from the patent which it is said to have anticipated,' Midland Flour Milling Company v. Bobbitt (C.C.A.8) 70 F.(2d) 416, 418 * *."

The articles in question were not before the Patent Office and were not considered by that office in connection with the application for and the issuance of the patent in suit.

13. Further consideration will be given to those publications following reference to some phases of the patent in suit.

Section 112 of 35 U.S.C.A. provides as follows:

"The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

"The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

"An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

The patent contains two pages of drawings designated as figures 1 through 6 inclusive. The various parts of the figures are numbered. The drawings disclose the various features of the farrowing pen which is the subject matter of the patent. No dimensions are given in the drawings or specifications or in any other place in the patent. The drawings disclose a circular outer structure; a hover inside of it which is off-center to it; a grilled opening in the rear of the hover; a door in the outer structure which is opposite the opening into the hover; a guard rail ex-

tending around the outer wall; a floor which slopes towards the hover; and a heating lamp in the hover.

The opening recital on the patent is as follows:

"This invention relates to a novel pig brooder affording a protective shelter for young pigs and which is so constructed that the sow can only lie in one position within the brooder and in which position the body of the sow is disposed so that the litter of baby pigs may readily nurse.

"More particularly, it is an aim of the present invention to provide a novel pig brooder or farrowing enclosure in which a litter of baby pigs will be protected from drafts or being stepped upon and crushed by a sow and including a hover structure for containing the baby pigs and from which the baby pigs can readily nurse while the sow is lying in the brooder or farrowing enclosure.

"A further object of the invention is to provide a brooder or farrowing enclosure involving a novel location of the hover whereby a sow is prevented from lying down in the enclosure except in a position in which the litter of pigs can readily nurse the sow and while in the protected area afforded by the hover.

"Various other objects and advantages of the invention will hereinafter become more fully apparent from the following description of the drawings, illustrating a presently preferred embodiment thereof; * * *."

In the transcript, pages 210 and 211, in the cross-examination of Mr. Collins by counsel for the defendant, the following appears:

"Q. Now, Mr. Collins, I would like to refer you to plaintiffs' exhibit 2, and ask you to tell the Court what, in your own words, you feel your invention is, in the patent number 2,740,-379?

*    *    *    *    *

"A. It's a farrowing house for farrowing baby pigs, constructed through experiment to the dimensions that you can guide the sow to a position to farrow in the location that you, by experience, have strived for so that the sow would be in the rear position of the house, but that she would not farrow in the front position of the house."

14. Pages 15, 16 and 17 of the issue of the New Zealand Dairy Exporter dated February 2, 1953, appear in evidence as Exhibit "A." Pages 1, 3 and 4 of the issue of the New Zealand Farmer dated January 1, 1953, appear in evidence as Exhibit "B." Exhibit "A" contains an account of the annual conference of the District Pig Council Supervisors in which Mr. D. M. Smith, research officer in pig husbandry at Ruakura Animal Research Station, lead the discussion on housing for pigs. In the article in Exhibit "A," it is stated that Mr. Smith first discussed the temperature problem in connection with pig farrowing. The article then continues as follows:

"The Ruakura 'Round House.'

"In an attempt to solve the temperature problem and also reduce the hazards to young pigs in the farrowing house, an experimental house of somewhat radical design has been built at Ruakura. The results of the latest research have been incorporated in the planning of the 'Round House,' and it is expected that it will carry a litter through to porker weight.

"Demonstrating the house to the Supervisors, Mr. Smith pointed out that with an internal radius of 3 ft. 10 in. and a depth varying from 3 ft. to 3 ft. 6 in. the house has a capacity of about 150 c. ft., which is considerably smaller than the conventional farrowing house, and it contains a body of air that the sow and litter should be able to keep warm with their own body heat. The roof of the house is divided into two leaves which can be raised and lowered to

control large scale ventilation and temperature adjustment, while the provision of a louver ventilation control across the hinges of the two leaves permits a finer adjustment of the movement of air inside. The hinged roof offers a means of access to the house when it's necessary for a man to get in, and also makes inspection easy. Another important feature in the over-all temperature control is the curved concrete baffle just 18 in. inside the entrance, which restricts the flow of air into the house through the opening—cutting down the draught and incidentally doing away with the door.

### "Safety Zone.

"Inside the 'Round House,' but set slightly off centre, is what amounts to a safety zone for the young pigs. The curved concrete baffle serves as half the wall enclosing this circular creep, and the wall is completed by a curbed steel frame. This can be removed once the pigs grow larger and more floor space is required.

"As the sow moves into the house she is immediately confronted by the baffle which compels her to turn either to the left or the right, and the positioning of the creep makes it impossible for her to lie down confortably until she reaches the back of the house. But there, too, the design of the house brings forces to bear on her to make her behave in a manner which will be conducive to the safety of her litter.

### "One Way Only.

"The gentle slope of the floor and the curved wall dictate that she shall be comfortable if she lies down with her own back curved along the wall, but uncomfortable if she attempts to lie with her feet against the wall and her back against the steel frame. Farrowing in this position means that the piglets have no distance to travel to the safety zone to which they are attracted by an electric heat lamp which hangs there. (In this connection it is worth noting that Mr. Smith said he was not quite sure whether it was the heat or the light which attracted the young pigs, though he suspected that it was the light. And this, of course, is an important consideration because it could mean that electricity would not be essential). As the sow must lie with her teats facing the creep, the piglets virtually have their feed delivered at their sleeping quarters, and then, when she gets up, it is quite impossible for her to turn around and go back the way she came—all of which are points that will reduce the mortality rate due to overlaying—one of the greatest hazards in our piggeries.

"Although he stressed the fact that the 'Round House' at Ruakura was only in the experimental stages of development and that experience might well lead to many modifications, Mr. Smith suggested that a farrowing house of that type would lend itself to prefabrication and so cheaper construction."

On page 15 of Exhibit "A" there appears a photograph of a hog house constructed of cement blocks with a hinged roof. The view is an outside view taken facing the door of the structure. On page 17 there appears a photograph of the interior of the hog house with the following caption underneath: "An interior view of the 'Round House' shows the curved baffle which is set about 18 in. in from the entrance and the curved steel frame, which together enclose the creep. A heat lamp hangs in the centre of the creep, and boards between the creep and the wall prevent the young pigs from wandering outside."

Exhibit "B" contains an article by Ronald Vine entitled, "Revolutionary New Farrowing House Being Developed at Ruakura." The opening paragraph of the article is as follows:

"The very unconventional pig house illustrated in the accompanying pictures is a new farrowing house for sows which has been built,

but which is still in an experimental stage, at Ruakura Animal Research Station."

The following statements appear in the article:

"Before considering what are the motives behind the various unusual details of this design, consider the design as a whole. The house is circular in shape, much smaller in floor area and lower in height than is usual in farrowing houses, and the space inside for the sow is still further reduced by an off-centre, circular brooder or hover area which she cannot enter, but which the piglets can, and in which hangs an electric heat lamp. The roof is hinged along the central ridge, each side lifting up like the lid of a bin.

\* \* \* \* \* \*

"Also related to the problem of warmth and ventilation is the provision of an air baffle just inside the entrance doorway. This avoids the need for a door (which might never be used anyway) and yet protects the opening from the unobstructed passage of air which passes in and out of the permanently open doorway of the conventional farrowing house. Looking directly through this doorway you see, not the back wall inside the house, but the protecting face of the baffle just inside the doorway.

"Another essential feature in any farrowing house which aims at fulfilling all the requirements indicated by research is a hover or brooder area, heated by an electric heat lamp, under the rays of which the piglets can sleep, not only at optimum temperature, but also safe from being lain on by the sow. This is provided in this house near the middle of the floor, the curved wall of the baffle forming half of the brooder enclosure, the other half being in the form of a welded steel grating through which the piglets, but not the sow, can pass, and which is removable so that the floor area can

be increased when the brooder is no longer required and the pigs grow larger. The aim is to have a house in which a litter can grow to pork weight, though at present it has not been decided definitely just how many pigs of pork weight this house could satisfactorily accommodate.

"To reduce as far as possible the danger to the piglets from overlaying by the sows must be a foremost aim in designing a farrowing house, for this is one of the serious causes of loss in the pig industry in New Zealand, despite the common use of farrowing rails. In fact, it has been amply demonstrated that farrowing rails in the conventional farrowing house are largely ineffectual in preventing overlaying, since the majority of deaths from this cause happen in the middle of the floor.

"A device which has proved effective in preventing overlaying overseas is the farrowing crate, a contrivance something like a large weighing crate which is put into the house, and into which the sow is put just before she farrows. The crate has to be removed soon afterwards. Inside the crate the sow is confined in such a way that it is almost impossible for her to lie on her piglets.

"But for New Zealand conditions the farrowing crate has the disadvantage that it requires a degree of attention, and an amount of labour to handle it, which the New Zealand dairy farmer is seldom prepared, and often not able, to give it. At the same time it has been proved an effective guard against overlaying, which is a problem that must be met somehow or other before any New Zealand farrowing house can be considered ideal.

"To provide something of the effect of a farrowing crate, but without its disadvantages, is the chief reason for the circular shape of the house. It will be seen that the brooder area forms a smaller circle

inside the larger one, and that it is set considerably off centre, leaving a passage which is narrow at one side of the house and wider at the other. The door enters on this narrow passageway, and by it the sow can walk to the back of the house, either to right or to left as she enters. She cannot, however, lie down in this passage, or at least she cannot lie down to farrow in it.

"When she enters the house she has no option but to walk round to the back of the house, where the floor space is wide enough for her to lie down. However, even here she is, perhaps without realising it, under strict control, for she can only lie down one way. The curve of the wall and the restricted floor space compel her to lie down with the curve of her back to the curve of the wall, in other words, with her belly facing the centre of the house, where the brooder is. Thus the piglets have the shortest possible distance to travel between the sow for suckling and the brooder for sleeping, the normal hazards from the sow being accordingly reduced.

"When the sow stands up she still cannot turn round in the space provided for her (another reduction in the hazards to the piglets) but must go on walking ahead, by which route, of course, she comes back to where she started—the doorway.

"Because the sow's farrowing-place is thus restricted in area, it should not be thought that she is in any way uncomfortable. She has ample space to lie down in, but that space is shaped so that she can only lie in one direction, facing only one way. Obviously a sow confined in this way is very much more free and comfortable than one held in a farrowing crate of the kind used in other countries.

"Thus the round shape of the house, in conjunction with the off-centre placing of the brooder, provides the house with what is, in effect, a farrowing crate, but without the disadvantages of a farrowing crate; there is no lifting it in and out and storing it, the sow walks into it herself and walks out again.

"For this feature of the design to function properly, the house must, of course, be built to very carefully planned dimensions. The narrow space between brooder and walls must be the right width for a sow to walk but not to lie down in, the wider space at the back must be wide enough for her to lie down in comfortably but not to turn round in. Here, again, the prototype house shown in these pictures is still an experiment, and only experience will show if the dimensions are exactly right or not."

On page 3 of the article there are two photographs. Each portrays a circular hog house built of cement blocks with a hinged roof. Both photographs are exterior views of the house. On page 4 of the article is portrayed an interior view of the same house with the following caption:

"Inside the farrowing house, showing brooder with heat lamp in position and a sow occupying the farrowing area, in which she can lie comfortably, but only with her back to the wall, and in which she cannot turn round."

In the photograph the sow is shown next to the grilled opening of the brooder, or hover.

15. It was heretofore noted that in order for a publication to invalidate a patent the publication must contain sufficient information so that those skilled in the art could understand the nature and operation of the invention without assistance from the patent. However, it would seem that in evaluating the information given in the publications referred to in connection with the matter of the claimed disclosure of the invention in the patent in suit, it would be helpful to make a comparison between the information given in the publications and the claims set forth in the patent.

| Element of Claim from Patent | Part No. of Patent | Exhibit A | Exhibit B |
|---|---|---|---|
| | Claim 2 | | |
| A pig brooder as in claim 1 | See analysis of claim 1 on which claim 2 depends. | | |
| said hover being eccentrically disposed within the enclosure defined by said outer wall | 17 | page 16, column 4, paragraph 2. "Inside the 'Round House', but set slightly off centre, is what amounts to a safety zone for the young pigs." | page 3, column 4, paragraph 3. "It will be seen that the brooder area forms a smaller circle inside the larger one, and that it is set considerably off centre, leaving a passage which is narrow at one side of the house and wider at the other." |
| and being disposed with its center nearer the entrance and exit opening than the part of the outer wall located opposite said wall opening, | | picture on page 17; page 16, column 4, paragraph 3. "As the sow moves into the house she is immediately confronted by the baffle which compels her to turn either to the left or the right, and the positioning of the creep makes it impossible for her to lie down comfortably until she reaches the back of the house." | page 3, column 3, paragraph 1. "Also related to the problem of warmth and ventilation is the provision of an air baffle just inside the entrance doorway. This avoids the need for a door and yet protects the opening from the unobstructed passage of air which passes in and out of the permanently open doorway of the conventional farrowing house." |
| the hover being spaced from said outer wall a sufficient distance to permit a sow to readily pass through the wall opening and around the hover. | | page 16, column 4, paragraph 3. "As the sow moves into the house she is immediately confronted by the baffle which compels her to turn either to the left or the right, and the po- | page 3, column 4, paragraphs 3 and 4; page 4, column 1, paragraphs 1 and 2. |

| Element of Claim from Patent | Part No. of Patent | Exhibit A | Exhibit B |
|---|---|---|---|
| | | sitioning of the creep makes it impossible for her to lie down comfortably until she reaches the back of the house. But there, too, the design of the house brings forces to bear on her to make her behave in a manner which will be conducive to the safety of her litter." | |
| | Claim 3 | | |
| A pig brooder as in claim 2, | This claim is dependent from claim 2. See the limitations of claim 2 above. | | |
| said hover wall portion being solid | | picture on page 17; page 16, column 4, paragraph 2. "The curved concrete baffle serves as half the wall enclosing this circular creep, and the wall is completed by a curved steel frame. | page 3, column 3, paragraph 2. "This is provided in this house near the middle of the floor, the curved wall of the baffle forming half of the brooder enclosure, the other half being in the form of a welded steel grating." |
| and being disposed adjacent the outer wall opening. | | picture on page 17; page 16, column 4, paragraphs 2 and 3. | page 3, column 4, paragraphs 3 and 4. "It will be seen that the brooder area forms a smaller circle inside the larger one, and that it is set considerably off centre, leaving a passage which is narrow at one side of the house and wider at the other. |

| Element of Claim from Patent | Part No. of Patent | Exhibit A | Exhibit B |
|---|---|---|---|
| | | | The door enters on this narrow passageway, and by it the sow can walk to the back of the house." |
| | **Claim 4** | | |
| A pig brooder as in claim 3, | Claim 4 is dependent from claim 3 and contains all of the elements of claim 3. See elements of claim 3 above. | | |
| said solid hover wall portion and the open-work guard portion of the hover each being substantially of semi-cylindrical shape. | | picture on page 17; page 16, column 4, paragraph 2. "The curved concrete baffle serves as half the wall enclosing this circular creep, and the wall is completed by a curved steel frame." | page 3, column 3, paragraph 2. "This is provided in this house near the middle of the floor, the curved wall of the baffle forming half of the brooder enclosure, the other half being in the form of a welded steel grating." |
| | **Claim 5** | | |
| A pig brooder as in claim 4, | Claim 5 depends from claim 4. See elements in connection with claim 4. | | |
| heating means disposed within the hover and above the hover floor, | | picture on page 17; page 16, column 4, paragraph 4. "* * Farrowing in this position means that the piglets have no distance to travel to the safety zone to which they are attracted by an electric heat lamp which hangs there." | page 3, column 3, paragraph 2. "Another essential feature in any farrowing house which aims at fulfilling all the requirements indicated by research is a hover or brooding area, heated by an electric heat lamp, under the rays of which the piglets can sleep, not only at optimum temperature, but also safe from being lain on by the sow." |

| Element of Claim from Patent | Part No. of Patent | Exhibit A | Exhibit B |
|---|---|---|---|
| and means for suspending said heating means from above the hover. | | picture on page 17; page 16, column 4, paragraph 4. | page 3, column 3, paragraph 2. |
| **Claim 6** | | | |
| A hover as in claim 1, | See elements described in claim 1. | | |
| said floor sloping downwardly and inwardly from said outer wall to the hover, | 9 | page 16, column 4, paragraph 4, line 1, refers to a sloping floor. | Elevation of hover floor not described or shown. |
| a portion of said floor, constituting the hover floor, being disposed above the level of the sloping floor portion disposed immediately therearound and below the level of the sloping floor portion disposed adjacent said outer wall. | | Elevation of hover floor not described or shown. | Elevation of hover floor not described or shown. |
| **Claim 7** | | | |
| A pig brooder as in claim 6, | See the elements described in claim 6. | | |
| said floor including a substantially flat portion, disposed below the level of the hover floor and extending from the hover and through said outer wall opening, the inner lower part of said sloping floor portion being disposed at the same level or above the level of the flat floor portion. | | page 16, column 4, paragraph 4, line 1, refers to sloping floor. Elevation of hover floor not described or shown. | Not described or shown. |
| **Claim 8** | | | |
| A pig brooder as in claim 7, | See the elements described in claim 7. | | |
| and a guard rail extending around the sloping floor portion and disposed above and adjacent thereto and inwardly of and adjacent said outer wall. | 19 | guard rail shown at the right hand side of picture on page 17. | guard rail shown at 19 in picture on page 4. |
| **Claim 9** | | | |
| A farrowing enclosure | 8 | shown in pictures on pages 15 and 17. | shown in pictures on pages 3 and 4. |

| Element of Claim from Patent | Part No. of Patent | Exhibit A | Exhibit B |
|---|---|---|---|
| including a floor, | 9 | page 16, column 4, paragraph 4. | page 3, column 3, paragraph 2. "This is provided in this house near the middle of the floor." |
| an upstanding substantially cylindrical wall rising from said floor | 10 | shown in pictures on pages 15 and 17. | shown in pictures on page 3. |
| and provided with an entrance and exit opening in a part thereof extending upwardly from the floor, | 11 | shown in pictures on pages 15 and 17. | shown in pictures on page 3; page 3, column 4, paragraph 4. |
| and a cylindrical hover disposed within said enclosure eccentrically with respect to said cylindrical wall | 15 | picture on page 17; page 16, column 4, paragraph 2. "Inside the 'Round House', but set slightly off centre, is what amounts to a safety zone for the young pigs." | page 3, column 3, paragraph 2. "Another essential feature in any farrowing house which aims at fulfilling all the requirements indicated by research is a hover or brooder area." |
| and having its center disposed nearer said wall opening than the wall portion disposed opposite to said opening, | | picture on page 17; page 16, column 4, paragraph 3. | page 3, column 4, paragraph 3. |
| said hover including a segment of openwork construction. | 17 | picture on page 17; page 16, column 4, paragraph 2. "The curved concrete baffle serves as half the wall enclosing this circular creep, and the wall is completed by a curved steel frame." | page 3, column 3, paragraph 2. "This is provided in this house near the middle of the floor, the curved wall of the baffle forming half of the brooder enclosure, the other half being in the form of a welded steel grating." |

Claim 10

| A farrowing enclosure as in claim 9, | See the elements described in claim 9. | | |
|---|---|---|---|
| said hover having a solid substantially semicylindri- | 16 | picture on page 17; page 16, column 4, | page 3, column 3, paragraph 2. |

| Element of Claim from Patent | Part No. of Patent | Exhibit A | Exhibit B |
|---|---|---|---|
| cal wall portion located adjacent said opening. | | paragraph 2. "The curved concrete baffle serves as half the wall enclosing this circular creep, and the wall is completed by a curved steel frame." | "This is provided in this house near the middle of the floor, the curved wall of the baffle forming half of the brooder enclosure, the other half being in the form of a welded steel grating." |
| | Claim 11 | | |
| A farrowing enclosure as in claim 10, | See the elements described in claim 10. | | |
| said floor sloping downwardly and inwardly from said cylindrical wall toward the hover and including a hover floor portion disposed above the level of the adjacent part of the sloping floor portion and below the level of the remote part of said sloping floor portion. | | page 16, column 4, paragraph 4, line 1, refers to a sloping floor. Elevation of hover floor not shown or described. | Not described or shown. |

16. The hog houses sold to the Morrison Co-operative were sold in unassembled form. The floor in the house purchased by the defendant from the Morrison Co-operative was installed by him. It was the practice of the plaintiff to sell the houses in unassembled form without floors. The houses were accompanied with instructions for their installation. In the instructions, attention was called to the matter of installing sloping floors. In certain claims of the patent, reference was made to the elevation of the hover floor above the floor surrounding it. As to whether those purchasing houses from the plaintiffs did or did not elevate the floor of the hover in erection of the houses does not appear. That feature would not appear to be of significance and importance. However, it would appear that the matter which would be of significance and importance as to the floor was the fact that it sloped towards the hover so as to make conditions more conducive for a sow to lie with her back away from the hover.

17. In Exhibit "A," page 16, column 4, paragraph 1, it is stated that the hog house described had an internal radius of 3 feet and 10 inches, which would make the structure approximately 8 feet in diameter. In the same paragraph it is also stated that the structure had a depth (height) varying from 3 feet to 3 feet 6 inches. In the same paragraph it is stated the curved concrete baffle is 18 inches inside the entrance to the structure. No other dimensions are given. It is the contention of the plaintiffs that the dimensions given as to the structure in Exhibit "A" do not give sufficient sizes or dimensions so that one skilled in the art could construct a structure similar to that which is the subject matter of the patent. In the patent no sizes or dimensions are given. It is the claim of the

defendants that farrowing houses for sows are usually 8 feet by 8 feet and that those skilled in the art, by assuming that the house shown in the drawing was 8 feet in diameter, could, by use of a slide rule, work out the sizes and dimensions of the rest of the structure. In McCrady, Patent Office Practice, 3d Ed., in referring to the drawing to be provided in the patent application, it is stated (p. 139): "The drawing should be large enough to permit of easy reading * * *. The drawing need not be made to scale, nor need the proportions be exact, since it is not a working drawing but is intended merely to illustrate the idea of the patent." It is, of course, well settled that the claims of the patent are to be construed in the light of the drawings and specifications.

▮ The question as to whether a farrowing house of the type here involved would produce the desired and anticipated results could only be answered by the use of the house. In Exhibit "B" the farrowing house described and shown therein is referred to as being in the experimental stage. Mr. Smith, at the time of his conversation with Mr. Collins at the University of Minnesota in January, 1954, stated that the house was "not functioning at the time." Thus, the situation was that at the time of the publication of the articles contained in Exhibits "A" and "B" the Ruakura Research Station had not used the farrowing house for farrowing purposes and it was not known whether a farrowing house of that type would achieve the desired and anticipated results. However, if a farrowing house having the features disclosed in the articles referred to would achieve the desired and anticipated results, the fact that it was not known until later that it would achieve such results would not render nugatory the disclosures contained in the articles referred to.

18. It is clear that the pivotal question is whether the publications, Exhibits "A" and "B," did describe the invention claimed in the patent in suit sufficiently so that those skilled in the art could understand the nature and operation of the invention and carry it into practical use without assistance from the patent. By way of convenience, when hereinafter in this paragraph reference is made to a feature being described or shown in the publications, it shall mean, unless otherwise indicated, that the feature or features are described or shown in either Exhibit "A" or Exhibit "B," or in both of them. The publications disclose and show a circular farrowing pen designed for the use of one farrowing sow which is approximately 8 feet in diameter and from 3 feet to 3 feet 6 inches in height with an entrance into it. They disclose that pen has a hinged flat roof and an inwardly sloping floor. They disclose an inner circular hover which it set off center to the main circle of the structure and adapted to constitute a safety zone for a litter of pigs. They disclose that the hover has a solid wall except for a grilled opening into it on the side away from the entrance into the structure. They disclose that the interior arrangements of the pen are such as to make it impossible for a sow to lie down comfortably except with her back to the wall opposite the grilled opening into the hover. They disclose a heating lamp suspended over the middle of the hover. They disclose a hover in which the pigs can sleep and nurse at optimum temperature safe from drafts and safe from being lain on by the sow. They disclose a guard rail around the inner side of the outer wall of the structure. The comparison heretofore set forth between the claims of patent and the matters described or shown in the publications show that all of the features set forth in the claims are described or shown in the publications, except the feature of the hover floor being elevated above the main floor of the structure, which feature does not appear to be of significance.

▮ 19. The Court finds that the defendant has clearly and satisfactorily established that a person skilled in the art of constructing hog houses with Exhibits "A" and "B" before him could construct

the invention claimed in the patent in suit without assistance from that patent.

20. The plaintiffs in this action, at all times since the issuance of the patent in suit, have had the good faith belief that it was a valid patent. They brought the present action in that belief. In this action they have earnestly contended that the patent is a valid patent. The question of the invalidity of the patent was not and is not free from doubt. The plaintiffs brought the present action in the good faith belief that the defendant had infringed the patent. The evidence does not disclose any improper conduct on the part of the plaintiffs in connection with the patent or this action. The Court finds that this is not such an exceptional case as to justify an award of attorney fees to the defendant under Section 285 of 35 U.S.C.A.

## Conclusions of Law

1. This Court has jurisdiction of the subject matter of this action under Section 1338(a) of 28 U.S.C.A.

2. The New Zealand publications identified as Exhibits "A" and "B" constituted publications within the meaning of Section 102 of 35 U.S.C.A.

3. The invention claimed in United States Letters Patent No. 2,740,379, granted Robert A. Collins on April 3, 1956, pursuant to an application filed therefor on August 20, 1954, was described more than one year prior to the application in the publications labelled Exhibits "A" and "B."

4. United States Letters Patent No. 2,740,379 is invalid as lacking in invention.

5. No attorney fees should be awarded to the defendant.

6. The taxable costs of this action should be assessed against the plaintiffs.

## Order for Judgment

It Is Hereby Ordered that judgment shall be entered in accord with the foregoing Findings of Fact and Conclusions of Law, except that the Court will enter a separate ruling relating to costs.