**RICH PRODUCTS CORPORATION,**
Appellee,

v.

**MITCHELL FOODS, INC., and Frank S. Mitchell, Appellants.**

No. 156, Docket 29952.

United States Court of Appeals
Second Circuit.

Argued Jan. 4, 1966.

Decided Feb. 15, 1966.

Rehearing Denied April 11, 1966.

Hugh A. Chapin, New York City (Kenneth R. Sommer, and Popp & Sommer, Buffalo, N. Y., Edward W. Greason, and Kenyon & Kenyon, New York City, on the brief), for plaintiff-appellee.

Malcolm K. Buckley, Buffalo, N. Y. (Bean, Brooks, Buckley & Bean, Buffalo, N. Y., on the brief), for defendants-appellants.

Before MOORE, SMITH and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

This is a suit for infringement of claims one to four of United States Letters Patent No. 2,868,653, applied for on December 3, 1954 and issued on January 13, 1959 to Robert E. Rich, as assignee of Holton W. Diamond and Eugene L. Powell, the joint inventors. Rich assigned the patent and his rights for past infringement to the plaintiff, Rich Products Corporation.

Subsequent thereto the appellee commenced this action in the Western District of New York, alleging that the patent was being infringed, and demanding an accounting and injunction. The appellants denied the infringement, and affirmatively claimed that the patent was invalid because (1) it had been anticipated by (a) a patent granted in a foreign country more than one year prior to the date of the application for the United States patent (35 U.S.C. § 102(b) (1964 ed.)), and (b) a description in a printed publication in this country also prior to the application (35 U.S.C. § 102(a) (1964 ed.)), and (2) that the subject matter as a whole was obvious at the time of the invention (35 U.S.C. § 103 (1964 ed.)).

The patent describes various liquid emulsions which, when whipped, change in appearance and characteristics into a firm non-pourable product suitable for use as a salad or dessert topping. The appellee, Rich Products Corporation, has for twenty years been in the business of manufacturing and distributing whippable emulsions, and since the spring of 1956 has manufactured and distributed the product described in the patent in suit.

The record discloses that the desirable qualities of a commercial grade, whippable emulsion topping are: a consistently high yield of whipped topping from the liquid emulsion; a consistently stable topping which will not shrink, weep or collapse, or otherwise become deformed prior to consumption; and the attribute of remaining unspoiled even when stored for a relatively lengthy period. The patent in suit produces a product which possesses all of those qualities.

The whippable emulsions specified in the patent have four essential ingredients: water, an edible natural glyceride fat, a substituted cellulose of a special type, and at least one of a specified group of emulsifiers. In addition, sweeteners or flavoring substances may be, and normally are, added. These ingredients are then blended together as set forth in the patent to produce the cream product.

With regard to these components, the edible fat may be derived from animal or vegetable sources and the substituted cellulose is defined in the patent as one in "which at least some of the hydrogen molecules have been substituted with alkyl groups containing not more than two carbon atoms and at least part of such groups being methyl." The emulsifiers are described with particularity in the patent, but for purposes of this litigation they have been identified by their trade

names: Spans, Tweens, Myverol, Vrest and Myrj.

The patent in suit sets out five claims, four of which are at issue here, and each of the four teaches the use of the four essential ingredients. Claim One, the generic claim, recites the use of water, fat, a substituted cellulose and any one or more of the four named emulsifying agents. Claims Two, Three and Four each includes water, fat, a substituted cellulose and an emulsifier (Spans in Claim Two, Tweens in Claim Three, and Myverol or Vrest in Claim Four).[1] The function of the emulsifiers is to give the resulting product its characteristic of being particularly whippable and consistent. The substituted cellulose, which replaces protein, contributes the quality of keeping well in storage for a substantial period.

The trial court decided that the patent was valid and that it had been infringed by the appellants. It is from that decision that this appeal is taken. We affirm.

The questions before us are (1) whether, applying the usual standards of appellate review, there is sufficient in the record to support the findings of fact upon which the trial court based its conclusions of absence of anticipation in prior art and lack of obviousness at the time of invention, and (2) whether, applying the standard of full review, the facts found warranted those conclusions and the ultimate determination that the patent was valid. Crest Specialty v. Trager, 341 U.S. 912, 71 S.Ct. 733, 95 L.Ed. 1349 (1951), reversing 7 Cir., 184 F.2d 577 (7th Cir. 1950); Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950); Mahn v. Harwood, 112 U.S. 354, 358, 5 S.Ct. 174, 6 S.Ct. 451, 28 L.Ed. 665 (1884); Gross v. JFD Manuf. Co., Inc., 314 F.2d 196, at 198–199 (2d Cir.),

cert. den. 374 U.S. 832, 83 S.Ct. 1873, 10 L.Ed.2d 1054 (1963); Tatko Bros. Slate Co. v. Hannon, 270 F.2d 571, at 572 (2d Cir.), cert. den. 361 U.S. 915, 80 S.Ct. 260, 4 L.Ed.2d 185 (1959); Note, 29 U.Chi. L.Rev. 185 (1961).

## ANTICIPATION

The claim of anticipation is based largely upon two patents issued in Great Britain which described a product somewhat similar to that set forth in the present patent and upon a chemical study which is referred to as the "Pratt article." There is also a claim that one of the patentees improperly induced the Patent Office to grant the patent.

### The British Patents

The two British patents which the appellants cite as having anticipated the patent in suit are No. 555,361, issued in 1942, and No. 646,484, issued in 1950, a claimed improvement[2] on the 1942 patent. The central issue of the case, as pursued by the parties at the trial and in their briefs in this court, is a fairly narrow one and principally concerns the use of the term "glyceryl monostearate." The special significance of that substance in this litigation arises from its inclusion as an alternate ingredient in the British patent, and the appellants' contention that it is chemically and functionally the equivalent of the emulsifier, Myverol, specified in Claim Four of the patent in suit. The first British patent states that it "relates to the manufacture of a cream substitute and has as its object the manufacture of a cream substitute which will not suffer the souring or putrefying changes that are common to natural cream or to artificial creams * * *" The patent specification sets forth a formula which involves the use of two emulsifying agents, referred to as "A" and "B," both of which must be used. The other principal ingredient is a basic

---

1. Claim Five is not in dispute here because it specifies the use of Myrj which has been declared by the Food and Drug Administration as not suitable for human consumption.

2. Patent No. 646,484 varies in that it specifies different oils which may be used in the preparation of the basic fat blend.

fat blend.[3] The total process for manufacturing the cream substitute, as revealed in the British patent, involves the mixing of all of these ingredients, as well as desired sweeteners, in a specified manner.

In the British process glyceryl monostearate is not *the* emulsifying agent, though by nature it is an emulsifier. Its principal function under both British patents is to serve as an alternate fat-soluble vehicle for the coloring constituent, which the patent teaches "is preferably incorporated." The patents provide for an alternate formula for the basic fat blend which includes glyceryl monostearate to be used together with lecithin, both in very small relative portions. The emulsifier, however, in both British patents, is the function performed by agents "A" and "B." The patent in suit contains nothing comparable to agent "A," and its named emulsifiers are used in place of "A."

It appears from the record, and the district court so found,[4] after hearing much evidence on the point, that the glyceryl monostearate specified in the British patent is not the same substance that is referred to in the patent in suit. In its pure form glyceryl monostearate apparently exists only as a curiosity of the laboratory. However, various commercial forms of the composition are commonly available. The court found that the glyceryl monostearate mentioned in the British patent was comparable to a commercial variety known as "Aldo 33," and that Claim Four of the patent in suit actually describes a substance commercially marketed under the name Myverol 18–85. There was abundant evidence, largely the testimony of expert witnesses, to support the critical finding that Aldo 33 and Myverol 18–85 were substantially different both chemically and functionally. There was included in this evidence, testimony concerning two experiments, which were conducted by appellee's expert at the time of the trial, one using Aldo 33 and the other using Myverol 18–85 in the formula of the patent in suit. The resulting products differed significantly, and the one employing Myverol 18–85 exhibited the superiority in consistency and stability which the patent in suit claims.

The appellants make much of their assertion that glyceryl monostearate appears in both the British patents and in the patent in suit and that both Aldo 33 and Myverol may be encompassed within

---

3. Emulsifying agent "A" is described therein as "consisting of a harmless chloride, a harmless salt of a tribasic acid and an edible vegetable gum preferably a marine vegetable gum such as an alginate." Agent "B" is described as "comprising a [substituted] cellulose derivative." The "cellulose derivative" of agent "B" is said in the patent "to cover cellulose having a hydrogen atom replaced by a hydrocarbon radical—e. g., alkyl or aryl—and to cover mixed alkyl ethers or cellulose." The patent also sets forth a "basic fat blend consisting of a mixture of a hardened vegetable oil of the leguminosae group, such as arachis oil, processed butter fat and a hardened oil of the palmae group, such as coconut oil [or, if using Patent #646,484, a basic fat blend consisting practically entirely of hardened oil of the palmae group] * * *" "Glycerine and, if desired, additional water may be mixed with the two suspensions [the aqueous suspensions of agent "A" and agent "B"] forming the aqueous gum base."

4. The district court found: "* * * Neither of these specified emulsifying agents of the British patent was comparable to any of the four classes of emulsifying agents specified in the patent in suit. There is no ingredient in the patent in suit comparable to emulsifying agent "A" * * *. The glycerol monostearate of the British patent is comparable as an emulsifying agent to commercially available glycerol monostearate such as Aldo 33. The difference in function of these emulsifiers was shown in Diamond's affidavit submitted to the Patent Office. It was also shown at the trial. The experiment was repeated during the progress of the trial and the result shown at the trial. The glycerol monostearate of the British patent was not the same as Myverol 18–85 of the patent in suit. It is stated in the patent in suit that Myverol is purified by distillation under high vacuum. Such a process was not available until the early 1950's, whereas the British patent was published in August, 1943."

the general generic definition of glyceryl monostearate, but they did not prove that there was no chemical difference between them, nor did they persuasively refute the fact that the functions of these commercial versions in the respective patents were quite different and that the act of substituting Aldo 33 for Myverol in the formula of the patent in suit produced a distinctly inferior result.

The patent in suit does far more than merely restate the teaching of the British patent in some slightly variant manner. It is more than another method of doing the same thing. The British patent does not "bear within * * * [its] four corners adequate directions for the practice of the patent" in suit, Dewey & Almy Chemical Co. v. Mimex Co., 124 F.2d 986, 989 (2d Cir. 1942), and is, therefore, not an anticipation.

## The Pratt Article

The discussion by C. F. Pratt, entitled "Certain Partial Ester Emulsifier Levels in Food," which appeared in Volume VI, No. 11, Food Technology 425–30 (1952), dealt with the uses of four groups of emulsifiers in a wide variety of applications and safe levels for such uses. While it mentions that emulsifiers are of practical use in the making of popular cream whips, it does not say which, if any, would produce a result comparable to that achieved by the patent in suit, nor does it suggest any formula for such use; nor does it suggest how such a result could be achieved through the use of a particular emulsifier together with the teaching of the British patents.

■ A prior printed publication in order to defeat a patent "must exhibit a substantial representation of the patented invention. It must be in such full, clear and exact terms as to enable one skilled in the art to practice the patented improvement without the exercise of inventive skill of his own and without assistance from the patent claimed to have been anticipated." 1 Deller's Walker on Patents § 60, at 277–78 (2d ed. 1964); Seymour v. Osborne, 11 Wall. 516, 78 U.S. 516, at 554–555, 20 L.Ed. 33 (1871);

Eames v. Andrews, 122 U.S. 40, at 64–66, 7 S.Ct. 1073, 30 L.Ed. 1064 (1886); Linde Air Products Co. v. Morse Dry Dock & Repair Co., 246 F. 834, 839 (2d Cir. 1917); Wisconsin Alumni Research Foundation v. George A. Breon & Co., Inc., 85 F.2d 166 (8th Cir.), cert. den. 299 U.S. 598, 57 S.Ct. 191, 81 L.Ed. 441 (1936). The Pratt article completely fails even to suggest any of the details necessary for the practical application of the invention.

## Misrepresentations to the Patent Office

The appellants also assert that one of the inventors, Diamond, made improper representations to the Patent Office Examiner while the application for the patent was being prosecuted. In effect, they say that Diamond represented to the Examiner that the glyceryl monostearate of the British patents was not an anticipation because the term as used in those patents referred to the laboratory or noncommercial glyceryl monostearate, which was a monoester, whose only fatty acid radicals were of stearic acid, rather than to commercial glyceryl monostearate, all forms of which contain radicals of fatty acids in addition to stearic.

■ Appellants argue that Diamond originally believed this himself and, through oral testimony and written affidavits, persuaded the Examiner that the British patents meant the single partial fatty acid esters of glycerine and were thus distinguishable from the patent for which he was applying; that he later found it was not true, and that he amended Example III of his patent to correct his misimpression. At the hearing before the examiner Diamond had also filed certain affidavits detailing experiments which demonstrated the different results which occurred when Aldo 33 was substituted for Myverol 18–85 in the formula specified in his patent. Both of these substances were commercial glyceryl monostearates, and each contained fatty acid radicals in addition to stearic.

The plaintiff-appellee offered persuasive evidence on this issue to prove there was no misrepresentation. The trial court found,

"Diamond's affidavit submitted to the Patent Office did not misrepresent the state of the art when the application for patent was pending. The representations made to the Patent Office were true. The examiner was not improperly induced to allow the claims of the patent in suit."

We are of the opinion that the trial court's findings of the basic or primary facts relating to the issue of anticipation in prior art, as well as the claim of misrepresentations to the Patent Office, are fully supported by the evidence and are not clearly erroneous. Moreover, our review of the conclusion which the court drew from those primary facts satisfies us that the patent was not invalid because of anticipation in prior art. Gross v. JFD Manuf. Co., Inc., supra, 314 F.2d at 198–199; Tatko Bros. Slate Co. v. Hannon, supra, 270 F.2d at 572.

*Obviousness of Subject Matter*

■ On the facts before us, which we have found to be clearly supported by the evidence, we conclude that the subject matter as a whole was not, at the time of the invention, obvious to a person having skill in the art.

■ The patent taught a formula which allowed the successful production, for the first time, of a substitute cream product which embodied not only characteristics of long life, but also of consistency, volume and whippability, which were commercially desirable. In other words, it furnished a satisfactory amount of whipped topping for the quantity of emulsion used; and the topping produced, unlike others, did not collapse but was unusually stable and held its whipped form. This advance was the result of something more than simply the skill and knowledge possessed by one familiar with the art. See, e. g., Lyon v. Bausch & Lomb Optical Co., 224 F.2d 530, at 534–536 (2d Cir.), cert. den. 350 U.S. 911, 76 S.Ct. 193, 100 L.Ed. 799 (1955); Reiner v. I. Leon Co., 285 F.2d 501, at 503–504 (2d Cir. 1960), cert. den. 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961).

This is confirmed by the fact that the need for the invention was demonstrated by the substantial and immediate success which the product enjoyed. Furthermore, despite independent efforts to develop such a product, appellants never succeeded in doing so; and it was not until they obtained a copy of the patent in suit that they began to market such a product. While commercial success cannot alone support "patentability," it can reenforce such a conclusion. Goodyear Tire & Rubber Co., Inc. v. Ray-O-Vac Co., 321 U.S. 275, at 279, 64 S.Ct. 593, 88 L. Ed. 721 (1944); Reiner v. I. Leon Co., supra, at 503; Technical Tape Corp. v. Minnesota Mining & Mfg. Co., 247 F.2d 343, 347–348 (2d Cir.), cert. den. 355 U.S. 952, 78 S.Ct. 537, 2 L.Ed.2d 529 (1957).

■■ The appellants, as defendants below, presented no evidence sufficiently persuasive to cast doubt on the correctness of Judge Burke's findings and the conclusions reached. There is a statutory presumption that a patent is valid, and it is the challengers, carrying the burden of proof, who must overcome it. This they failed to do. 35 U.S.C. § 282 (1964 ed.); Radio Corp. of America v. Radio Eng. Laboratories, Inc., 293 U.S. 1, 7–8, 54 S.Ct. 752, 78 L.Ed. 1453 (1934). The presumption is strengthened, in a case such as this, where the same questions were raised in prosecuting the patent in the Patent Office and there successfully met. Lyon v. Bausch & Lomb Optical Co., 119 F.Supp. 42, 43, at 45 (S.D.N.Y. 1953), aff'd 224 F.2d 530 (2d Cir.), cert. den. 350 U.S. 911, 76 S.Ct. 193, 100 L.Ed. 799 (1955); Cutler Mail Chute Co. v. Capitol Mail Chute Corp., 118 F.2d 63, at 64 (2d Cir.), cert. den. 313 U.S. 580, 61 S.Ct. 1096, 85 L.Ed. 1537 (1941); Nasco Inc. v. Vision-Wrap, Inc., 352 F.2d 905, at 908 (7th Cir. 1965).

Therefore, as the invention was neither anticipated by prior art nor obvious to one having ordinary skill in the art, we affirm the district court's conclusion that the patent was valid. There remains only the issue of infringement.

### INFRINGEMENT

The appellants deny that the whipped cream product which they have been manufacturing and marketing infringes the appellee's patent. They assert that the substituted cellulose, hydroxypropyl methyl, which they use, differs from the specification of the patent which calls for the use of a "cellulose substituted with alkyl groups comprising not more more than two carbon atoms and at least a part of such groups being methyl." Even though hydroxypropyl is not an alkyl group, the plain language of the claim does not require that the substitution be solely or exclusively alkyl groups; and hydroxypropyl methyl cellulose is a cellulose substituted with alkyl groups. Appellants' substituted cellulose is comprised of ⅚ methyl and ⅙ hydroxypropyl.

While the use of this ingredient by the appellants makes a slight technical variation from the language of Claim Four, there was sufficient support in the record for the trial court's conclusion that "the substituted cellulose used by the defendants is the chemical and functional equivalent of methyl cellulose and methyl ethyl cellulose, which are specifically described in the patent in suit."

 Under the "doctrine of equivalents," which applies to chemical substitutes, Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, at 607–609, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), the use by the appellants in this case of a substance which "performs substantially the same function in substantially the same way to obtain the same result" as the patented process, constitutes an infringement. Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, at 42, 50 S.Ct. 9, at 13, 74 L.Ed. 147 (1929). What is prohibited is not merely outright duplication, but also that more subtle duplication which is accomplished by a change in one of the non-critical aspects of the patent's teachings. If that were permitted, form would be elevated above substance, and literalness would triumph over fairness and good sense.

The judgment of the district court is affirmed.