**TRIMBLE PRODUCTS INCORPO-
RATED, Plaintiff,**

v.

**W. T. GRANT COMPANY and Sears
Roebuck & Co., Defendants.**

**No. 64 Civ. 637.**

United States District Court
S. D. New York.

March 21, 1968.

Morgan, Finnegan, Durham & Pine, New York City, for plaintiff.

Bader & Bader, New York City, for defendant.

## OPINION

MOTLEY, District Judge.

This patent infringement action was instituted by plaintiff, Trimble Products Incorporated, the owner of two United States Letters Patent relating to playpens for babies. Jurisdiction is predicated on 28 U.S.C. § 1338(a). The relief sought is the usual request for injunction and damages.

The first patent, # 2,908,021, the utility patent, describes the structure of the playpen.[1] It contains 13 claims. Plaintiff alleges that the playpen sold by defendant W. T. Grant Company infringes claims 1, 3, 4, 6, 10, 11 and 13 of the utility patent. Plaintiff alleges that the playpen sold by defendant Sears Roebuck & Company infringes claims 1, 3, 6, 10,

11 and 13 of the utility patent.[2] The utility patent was applied for on December 26, 1957, and issued October 13, 1959. The second patent, #186,358, is a design patent applied for on January 16, 1958, and issued on October 20, 1959. It contains one claim, i. e., "the ornamental design for a baby's playyard substantially as shown."[3] Plaintiff alleges the design patent has been infringed by the accused playpens. Both patents were issued on the application of James F. Fulton, the inventor, which he later assigned to plaintiff's predecessor.

The structure of the playpen in the utility patent is succinctly described by plaintiff as follows:

A divided hingedly interconnected floor section at the base of the playyard enclosure; a divided hingedly interconnected upper rectangular frame forming the top edges of the enclosure; a flexible skirt extending between the floor section and the upper frame forming the walls of the playyard enclosure; a pair of aligned parallel, collapsible "A" frames on opposite sides of the above structure for supporting the same and rendering it easily foldable.

A pair of aligned legs on opposite sides of the enclosure, each pair of aligned legs pivotally connected to the upper frame and diverging downward therefrom to form an inverted "V" and a brace extending between each leg and its associated frame member supporting the upper frame of the playyard when unfolded.

The hinged and pivotal connections are arranged so that once the braces are broken, the legs, frame, floor, and body of the playyard are all folded into a flat, collapsed condition in a single simple motion.[4]

1. The structure of the playpen as shown in Figure 1 of the utility patent is shown in Appendix A.

2. These claims which it is alleged defendants have infringed are set forth in Appendix B.

3. The design patent consists of four figures. Figures 1, 2, 3, 4, of the design patent are shown in Appendix C.

4. A model of the playpen showing it in a completely collapsed condition is shown in Appendix D. (Plaintiff's Exh. 28).

Plaintiff's expert witness described the design patent as follows:

(a) All of the vertical supporting structure is centrally located on only two opposed sides of the playyard, the structure on each side including only two legs and two braces, each set of legs and braces lying in a substantially single vertical plane. The legs and braces do not extend upwardly beyond the level of the top frame and the floor section extends laterally well beyond the legs at the point where it is mounted thereto.

(b) When unfolded and viewed from one end, there is a completely unobstructed expanse of the open mesh net enclosure, sweeping from the top to the bottom of the playyard.

(c) When viewed from the side, the sharply defined angles between the legs and braces create a pronounced geometric pattern of an inverted V and a W against the meshed background of the netted enclosure. Also, the low setting of the floor and its considerable width across the legs, creates an impression of stability.

(d) When viewed from the top, the bold, completely unencumbered rectangular outline of the playyard is impressive.

(e) When unfolded, but with one end dropped down, the top frame and crumpled mesh of the dropped end contrast sharply with the opposite end which remains upright and taut, creating a striking impression on the aesthetic sense of the observer.[5]

Plaintiff claims:

1) Fulton's inventions produced the first major advance in the playpen art and obsoleted prior art structures;

2) His radical departure from prior art techniques solved a long felt need and produced new, unexpected, and surprising results;

3) Fulton's inventions were immediately recognized throughout the industry and have been a striking commercial success;

4) Fulton's inventions were recognized by Tigrett Industries, Inc., of Jackson, Tennessee, the manufacturer of the playpens sold by defendants, through its slavish copies of the inventions, and

5) The patents in suit have been infringed by the Tigrett slavish copies.

Defendants, W. T. Grant Company and Sears Roebuck and Company, admit selling a playpen manufactured by Tigrett. Tigrett is supplying the defense of this suit although not named as a party in this action.[6] Defendants plead two major defenses which by a pretrial order became the issues tried: 1) the invalidity of the patents in suit, and 2) lack of infringement. Defendants' chief claim with respect to the invalidity of the patents in suit is that they lack invention over the prior art. More specifically, defendants assert: 1) each of the elements contained in the utility patent is found in one of the several prior art references on which defendants rely; 2) the utility patent is a combination of these prior art references and was directly anticipated by the Werner patent, and 3) the result of the combination in the Fulton patents fails to meet the test of non-obviousness. Title 35 U.S.C. §§ 101–103. The same claim is made by defendants with respect to the design patent. 35 U.S.C. § 171. In addition, defendants claim that the design patent is invalid because non-ornamental and dictated solely by mechanical and functional requirements of the utility patent.

Assuming, arguendo, the validity of the patents in suit, defendants deny infringement on the ground that as to each ac-

---

5. Figure 4 of the design patent shows the playpen with one side dropped. See Appendix C.

6. Defendants are sued in this district because each has a principal place of business in this district and the accused playpens have been sold by defendants in this district.

cused structure there is a departure from the Fulton playpen.

These differences with respect to the utility patent are:

1) The Grant structure does not have a pair of supporting members hingedly connected together at their inner ends;

2) The Sears structure does not have the supporting members hingedly connected since they are connected by a link.

The differences with respect to the design patent are:

1) The Grant structure has no truss member supporting the floor sections. The mesh in the netting of the Grant structure is hexagonal as opposed to square in the Fulton structure;

2) The Sears structure has a floor which is divided into equal halves whereas the Fulton structure has its floor section in unequal units. There are also no truss members supporting the floor sections of the Sears playpen. The mesh in the netting of the Sears model is also hexagonal.

### Invalidity of Patents

█ Plaintiff admits that upon the trial defendants were able to demonstrate through the testimony of an expert witness that the individual elements of the Fulton invention were known at the time the invention was made. Plaintiff properly asserts, however, that the fact that an invention is a combination of old elements is not determinative of the issue of patentability. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); United States v. Adams, 383 U.S. 39, 50, 51, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966); Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., 372 F.2d 263, 268 (2d Cir. 1967). In order to dispose of the combination as non-patentable on the ground that it is not new, it must be proved that the combination and its result were known or disclosed in one of the ways defined in 35 U.S.C. § 102. Graham v. John Deere Co., supra. This burden defendants failed to meet as set forth below. 35 U.S.C. § 282; Rich Products Corporation v. Mitchell Foods, Inc., 357 F.2d 176, 181 (2d Cir. 1966).

█ The fact that the invention consists of a result from a combination of old elements which has not before been achieved likewise does not dispose of the issue of patentability. There remains, as urged by defendants, the crucial test of non-obviousness. Graham v. John Deere Co., supra. Plaintiff denies that the differences between the prior art and the subject matter as a whole of the claimed inventions would have been obvious to a hypothetical mechanic chargeable with knowledge of the prior art at the time of the Fulton inventions. Plaintiff relies heavily upon the statutory presumption of validity. 35 U.S.C. § 282.

██ After a trial and review of the evidence, particularly the prior art references relied upon by defendants which include some not cited by the Patent Office, thus weakening the statutory presumption, Formal Fashions, Inc. v. Braiman Bows, Inc., 369 F.2d 536, 538 (2d Cir. 1966), the court finds and concludes that each of the patents in suit is invalid for lack of invention over the prior art in that they fail to meet the test of non-obviousness. Graham v. John Deere Co., supra. The result of the combination of old elements here does not rise to the level of invention. The result is the work of a skilled mechanic. The Fulton playpen, consequently, must join the growing list of patents which, since the Supreme Court's decision in the Graham case, have failed the test of non-obviousness.[7]

---

7. See, e. g.:
David & David, Inc. v. Myerson, 388 F. Sisko v. Southern Resin & Fiberglass Corp., 373 F.2d 866 (5th Cir. 1967), cert. den. 389 U.S. 824, 88 S.Ct. 60, 19 L.Ed. 2d 78 (Oct. 9, 1967); Kerr v. State Farm Life Ins. Co., 373 F.2d 62 (2d Cir. 1967); Formal Fashions, Inc. v. Braiman Bows, Inc., 369 F.2d 536 (2d Cir. 1966); L & A Products, Inc. v. Britt Tech Corp., 365 F.2d 83 (8th Cir. 1966); Kell-dot Industries, Inc. v. Graves, 361 F.2d 25 (8th Cir. 1966) cert. den. 385 U.S. 842, 87 S.Ct. 95, 17 L.Ed. 2d 75; Skirow v. Roberts Colonial House, Inc., 361 F.2d 388 (7th Cir. 1966); Skee-

■ Plaintiff's claims of striking financial success, satisfaction of long felt need in the industry, and of rendering the prior playpen art obsolete cannot tip the scales of patentability in its favor in view of the foregoing conclusion. Graham v. John Deere Co., supra.

In reaching the stated conclusion, the court applied the basic applicable criteria of patentability i. e., novelty, utility and non-obviousness, 35 U.S.C. §§ 101, 102, 103 and, training its attention with greatest intensity on the requirement of non-obviousness, found the patents in suit invalid. Graham v. John Deere, Co., supra.

*Novelty and Utility*

Defendants claimed that the patents in suit were not new because they had been directly anticipated by the Werner patent. The application for the Werner patent was filed on December 9, 1957. This was shortly before the filing of the utility patent in suit on December 26, 1957. The Werner patent issued on January 26, 1960. The Werner patent was not cited by the Patent Office as a prior art reference although pending in the Patent Office at the time the utility patent in suit issued on the earlier date of October 13, 1959. Although Werner sought to have patented a playpen essentially identical with the Fulton playpen, the Werner patent was ultimately issued for a very narrow advance over the Fulton patents, i. e., a pair of crossed legs which give additional support to the floor of the playpen. The pending Werner patent was not a part of the prior art since there was no patent issued on that pending application which should have precluded the Patent

Office from issuing a patent to Fulton. Hazeltine Research, Inc. v. Brenner, 382 U.S. 252, 86 S.Ct. 335, 15 L.Ed.2d 304 (1965). Defendants failed to prove by any other means that the Fulton patents were known or published or patented in any of the ways defined in 35 U.S.C. § 102 prior to their invention by Fulton. The evidence showed that the Fulton playpen was reduced to practice sometime in the summer of 1957. The Werner patent failed to resolve the issue of novelty of the combination of the Fulton patents in favor of defendants. 35 U.S.C. §§ 101, 102. Graham v. John Deere Co., supra. The court, therefore, concludes that the combination of old elements shown in the Fulton patent was new and useful.

*Non-Obviousness*

Before reaching the conclusion that the patents in suit fail to meet the test of non-obviousness, the court considered the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill in the pertinent art.

A. *Scope and Content of the Prior Art*

In addition to the prior art references cited by the Patent Office, defendants cited a number of additional prior art references. These references included not only baby playpens but baby carriages and baby cribs, all from the world of children's furniture. The majority of these playpens, carriages and cribs have one characteristic in common, i. e., their foldability or collapsibility. In short, foldable playpens were the order of the day when Fulton filed his claims.

Trainer, Inc. v. Garelick Mfg. Co., 361 F.2d 895 (8th Cir. 1966); Gould-National Batteries, Inc. v. Gulton Industries, Inc., 361 F.2d 912 (3rd Cir. 1966); American Infra-Red Radiant Co. v. Lambert Industries, Inc., 360 F.2d 977 (8th Cir. 1966) cert. den. 385 U.S. 920, 87 S.Ct. 233, 17 L.Ed.2d 144; Bentley v. Sunset House Distributing Corp., 359 F.2d 140 (9th Cir. 1966); Bercy Industries, Inc. v. Mechanical Mirror Works, Inc., 274 F.Supp. 157 (S.D.N.Y.1967); Teleflex Inc. v. American Chain & Cable Co. Inc., 273 F.Supp. 573 (S.D.N.Y.1967); Woods

Products Development Co. v. Cloud Oak Floor Co., 267 F.Supp. 193 (W.D.Mo. 1967); General Bronze Corp. v. Ward Products Corp., 262 F.Supp. 936 (N.D. N.Y.1966); C-Thru Products, Inc. v. Uniflex, Inc., 262 F.Supp. 213 (E.D.N.Y. 1966); RPTZ-PATCO, Inc. v. Pacific Inland Navigation Co., 253 F.Supp. 796 (D. Oregon 1966) aff'd, 377 F.2d 558 (9th Cir. 1967).

Design patents must meet the same criteria of patentability applicable to mechanical patents. 35 U.S.C. § 171.

Plaintiff does not claim that Fulton was the first to have invented a playpen. Plaintiff does not claim that Fulton was the first to have invented a foldable playpen. Plaintiff claims, in simplest terms, that Fulton invented a playpen which, in terms of foldability and design, has rendered obsolete the traditional wooden playpen. According to plaintiff's president, the foldability aspect is the heart of the claim of the utility patent in suit. What plaintiff claims is tantamount to invention here is that once the four brace bars which hold up the two top frame members of the playpen are broken, the playpen may be folded in one, simple, single motion, i. e., by pulling up the strap or handle which is attached to the larger section of the two part floor of the playpen.

Plaintiff's claims with respect to the design patent simply stated are that the Fulton playpen gives a neat appearance, an unobstructed view of the netting on two sides when opened, the impression of an inverted "V" and "W" against the mesh backgrounds on the opposite sides formed by the position of the legs and braces which support the upper frame, an impression of stability, and, finally, a striking impression in the aesthetic sense when one side of the top frame is dropped and the other side remains open and taut.

1. *The Utility Patent*

There were several prior art references cited by defendants showing a floor in a playpen or crib which folded upwardly. One of these prior art references, Gabriel, patented September 19, 1922, # 1,429,-335, shows a child's playpen called a "coop" having two floor sections.[8] The floor sections are hingedly connected along their outer edges to the side rails and hingedly connected along their inner edges to each other. A hand grasp, i. e., a ring, is seated in a recess formed in the upper face of one of the floor sections. By grasping this ring and pulling up, the two floor sections are lifted and the side

rails with the two non-collapsible sides are caused to move toward each other. The "contratile, lazy tongs" construction of two of the walls permits these walls to be folded to very compact form. This prior art reference was cited by the Patent Office.

Another prior art reference cited by the Patent Office, Neal, patented May 29, 1894, # 520,699, shows a folding crib. The floor, according to the patent, was "usually" made in two sections and connected by a hinge under the bottom of each section.

Another prior art reference offered by defendants but not cited by the Patent Office was a section of a magazine called SMALL WORLD. This section is devoted to playyards. The date of publication of this magazine was December 1957. The section devoted to playyards shows 19 models of playyards, also known as playpens. The following playyards, according to the descriptions below each model, had foldable floors: 1) The *Ped L Pen* model could be folded by stepping on a pedal without removing the pad, the latter being one of plaintiff's claims; 2) The *Foot-Fold* playpen also had a pedal which by pressing thereon the two sectioned floor would lift and with a slight pull, once the release buttons inside the top rails had been pushed folded the yard completely.

Although it is not clear from the descriptions under each model that the floor is divided into two parts, the following playyards were nevertheless described as easily foldable: 1) The *Edison Wood* playyard had "the step toe closing by which the yard folds compactly"; 2) The *Saf-T-Pen* would fold into "a neat, compact bundle for easy carrying."; 3) The *Safe-T-Babe* playyard was "easily foldable"; 4) The *Play-A-Round* playpen folded "flat as a wheel for storage"; 5) The *Colorama* playyard was also foldable; 6) *Abbott's* new playyard had an automatic "step-fold feature"; 7) The circular playpen manufactured by the

---

8. Figures 1 and 2 of the Gabriel patent showing the coop in an opened position and the two floor sections are shown in Appendix E.

Comfort Products Company could be folded up to "the size of a golf bag"; 8) The *Nockonwood* playyard folded "to a mere 7 inches in thickness"; 9) The *Symphonette Color-Tuned Play Yard* had a "pancake fold device"; 10) The *Deluxe Auto-Fold Play Yard* folded into a neat compact size for storage or travel by stepping on a foot pedal.

Another feature of the Fulton playpen which is essential to its foldability is the fact that the top frame folds. The top frame of the Fulton playpen consists of two members. These members fold downwardly when the two braces which hold up each member are broken. These members are "U" shaped, tubular, aluminum frames which face each other and are hingedly connected at their outer ends.

The Kolb crib, patented November 2, 1915, # 1,158,507, was not cited by the Patent Office but relied on by defendants. The Kolb patent shows a folding crib. The upper frame of the Kolb crib also consists of two members which fold upwardly when the crib is folded to a closed condition.[9] These upper frame members are "U" shaped and, according to the patent, preferably made of flat metal. The mechanism for getting the upper frame members of the Kolb crib to fold is different from the Fulton playpen. The upper pair of frame members of the Kolb crib are pivotally connected to a sliding plate placed in a vertical position on each side of the crib. The upper ends of the legs of the crib are also pivoted to the upper frame members at points about midway between the center of the crib and the ends of the crib. According to the patent, these pivot points act as fulcrums for the upper frame members and cause the center sliding plates to move up and down when the crib is being closed or opened. In order to release the sliding plates so that the crib may be folded, it is only necessary to push the spring pawls, described in the patent, inwardly and free them from the vertical slots formed in the sliding plates. This permits the sliding plates to move down-

wardly and to draw the inner ends of the upper frame members down with the sliding plates into a vertical position and also to draw the crossed legs together. The upper frame when opened is supported by two pairs of crossed legs pivotally connected to the upper frame on each side. The two legs on one side are aligned, respectively, with the two legs on the other side. The aligned legs have a common pivotal axis. The crossed legs give the appearance of an upright "V" and inverted "V" or an "X". The Kolb patent further shows a pair of bars each of which is rigidly connected at its opposite end to the two pair of aligned legs. In addition, the Kolb patent shows a flexible mesh skirt enclosing the crib and suspended at its upper end from the upper frame members and fastened at its lower end to the floor sections.

Another prior art reference, Needham (Great Britain), patented 1892, # 19,252, and cited by the Patent Office, describes "improvements * * * in folding cots, cribs, infants' baskets, and the like, and primarily consists in the employment of crossbars or straight supports forming legs crossed and jointed together about centrally between the upper and lower folding frames forming the cradle; the crossed supports are jointed at their upper ends to the folding upper frames, and the said supports are also jointed to the similar lower folding frames, whilst the folding frames of the cradle are themselves jointed centrally between the crossing bars. * * * Instead of the cradle frames falling when closed, the said frames may be arranged to fold upwardly instead of downwards".

2. *The Design Patent*

The Patent Office in considering the prior art applicable to the design patent in suit considered only two references: 1) Hagn Merchandiser, 1956, p. 837, top left, "Kiddie-Coop", and, 2) Furniture Age, May 1956, p. 20, bottom left playpen. The SMALL WORLD prior art reference relied upon by defendants also re-

---

9. A model of the Kolb crib as shown in Figure 1 of the Kolb patent is shown in Appendix F.

veals the extant designs of playpens when the Fulton design application was filed.

In that reference, there are two playpens showing a mesh material forming the sides or enclosure of the playpens, i. e., 1) The *Saf-T-Pen* (Houtz and Barwick's) and, 2) *Play-A-Round* (Thayer Co.). These playpens are described as being of light weight construction making them ideal for traveling. The *Saf-T-Pen* is square and constructed of tubular aluminum frames. It weighed only 10 pounds. The *Play-A-Round* is shaped like an inverted bonnet when opened. It folds "flat as a wheel for storage". It is constructed with round, tubular aluminum frames.

The Neal crib which was cited by the Patent Office is made of a netting or fabric as, e. g., canvas or, to quote the patent: " * * * any equivalent pliable material; netting, however, is preferred and the said netting may be of wire." The netting is attached to the top rectangular frame in its open position and is secured to the side bars of the frame and to the upper rungs of the legs "in any manner known to the trade." This is a crib which, as indicated above, has a floor usually divided in two sections and connected by a hinge, the floor sections being preferably of equal size, and the hinges being located under the floor sections.

The Kolb patent which was not cited by the Patent Office describes its sides as being made of "open mesh fabric". From the drawing in Figure 1 of the patent, the fabric appears to be identical to the fabric in the Fulton playpen. This is the crib with the "U" shaped frame members made of flat metal which are drawn downwardly when the crib is folded. The predominant design feature is created by the crossed legs which form a small "V" on top and a larger inverted "V" on the bottom on two sides of the crib. The crossed legs are drawn together when the crib is folded and the upper frame members assume a vertical position. The Kolb crib when distended or opened is strikingly similar to the Fulton playpen.

The Gabriel playpen or coop has a neat square appearance when opened. The sides shown in Figure 1 of the patent are made of "lazy tongs" which form a series of diamond shaped openings in a neat striking arrangement. This is the "coop" or playpen which has the two floor sections hingedly connected along their outer edges to the side walls and hingedly connected along their inner edges to each other. The total impression when viewed from the top, Figure 2, is one of unencumberance. The coop when distended or opened presents a square receptacle. The side walls of the coop, according to the patent, may be made of lattice structure or may be made of other suitable material.

The upper frame members of the Fulton playpen are held up by brace bars which are a simple two part mechanical structure designed to achieve the objective of holding up or letting down a frame. This is demonstrated by a different but mechanical prior art reference relied upon by defendants and not cited by the Patent Office, i. e., Urdang, patented February 24, 1914, # 1,088,488. The Urdang patent is a patent for a collapsible trunk. When opened, the top of the trunk is held up by a brace bar similar to the one shown in the Fulton patent for holding up the upper frame members.

The legs on the Fulton playpen form an inverted "V" and are pivoted to the upper frame and floor so that when the floor is pulled upwardly the legs may converge toward one another. The attachment of the brace bars to the legs and upper frame which form a "W" are necessary to support the upper frame. When the two brace bars supporting one of the upper frame members are broken, that side of the upper frame falls. The upper frame members are tubular as are the legs which, according to the patent, are "made of aluminum to reduce the weight to a minimum." The patent also points out that the body or skirt of the Fulton playpen is made of "nylon netting for lightness, openness, flexibility and strength, but obviously may be made of

other materials also." Thus, all of the features of the Fulton playpen are dictated by the mechanical or functional requirements of the Fulton playpen and are not ornamental.

### B. *Differences Between the Prior Art and the Claims at Issue*

Since the floor folding mechanism is a crucial feature of the foldability of the utility patent in suit, the differences between it and the upwardly folding floor of the Gabriel patent had to be ascertained. The Gabriel coop claims a pair of rigid and solid floor sections hingedly connected to the side rails along their outer edges and hingedly connected to each other along their inner edges. There is a ring or hand grasp on the upper face of one of the floor sections. The coop is collapsed by pulling upwardly on the hand grasp in the floor section and is opened by thrusting downward on said hand grasp. The floor sections are supported by a row of casters along their inner edges. The floor sections are so close to the ground that the casters "may engage the ground and support the floor sections along their hinged juncture with each other * * *".

The Fulton patent claims a floor comprising two sections. Each of these sections is rigid. A rigid supporting member is secured to each floor section beneath the section. Each of the supporting members is pivoted at its outer end to a bar for pivotal movement about an axis parallel to a common axis. The supporting members are hingedly connected together at their inner ends to hinge about an axis parallel to the common axis in order to fold the floor sections upwardly when the legs are moved toward one another. The Fulton floor sections are of different widths. There is a carrying strap secured to the wider floor section to fold the floor sections and the legs about their respective pivotal axes when a person pulls the carrying strap upwardly.

The Gabriel coop's foldability is thus accomplished in the same, single, upward pulling motion claimed by plaintiff with

respect to the Fulton playpen. In fact, the Gabriel coop actually fulfills the promise of the Fulton patent more readily than the Fulton patent, itself. The Fulton playpen cannot be folded until the four brace bars are broken. The Gabriel coop is folded in one single upward pulling motion.

The second most important feature of the Fulton patent which is responsible for its ready foldability is the folding upper frame members. The Needham patent which describes improvements in folding cots, cribs, cradles, babies' baskets, and the like, provided for the dropping downwardly of the upper folding frames of the cradle. The inventor points out that instead of the cradle frames falling when closed, the frames may be arranged to fold upwardly instead of downwards. The dropping of the upper frames of the Needham patent is accomplished by moving a flat piece of spring metal which is placed "vertically connected to the top and bottom joints of the folding cradle frame, and is formed with an aperture to take the pin or stud of the central joint of the closing bars". These crossing bars are the legs of the cradle. When the flat piece of spring metal is removed from the stud or pin, the top and bottom frame members drop, causing the crossed bar legs to come together. The top frames in the Fulton playpen are made to fall simply by breaking the four brace bars.

The significant difference, if any, between the floor folding mechanism of the Gabriel coop and the Fulton playpen is not apparent. Removing a flat spring from a stud or pin is different from breaking a brace bar, but the difference seems hardly obscure, technically speaking. Certainly, both differences were obvious to a person skilled in the art of foldable playpens at the time of the Fulton inventions.

### C. *The Level of Ordinary Skill In the Pertinent Art*

■ The prior art references relied upon by defendants show a predominance of collapsible baby playpens, cribs, and

carriages. As already pointed out, plaintiff certainly does not claim to be the first to have invented the foldable playpen. What plaintiff claims is that its playpen folds with one simple, single pulling up motion, once the four braces are broken. The prior art demonstrates that there was already the Gabriel playpen which did not even require the breaking of braces before the playpen could be folded. The Gabriel coop was folded by simply grasping the ring recessed in one of the floor sections and pulling upwardly, causing the non-collapsible side walls to move toward each other resulting from the "lazy tongs" construction of the other two walls. The ordinary mechanic's ability to cause the top frame of a playpen to fold is demonstrated by the Kolb, Needham, and Urdang patents. Brace bars similar to those shown in Urdang are shown in a French patent relied upon by defendants, i. e., Duteurtre, patented March 19, 1938, # 640,023, showing a completely collapsible baby carriage, and the Curtis patent, patented May 20, 1952, # 2,596,986, showing a more complicated brace bar used to hold up and drop an adjustable hospital table shown in Figure 10 of the Curtis patent. The conclusion seems inescapable, as defendants' expert testified, that the construction of the Fulton playpen was fully within the competence of an ordinary, skilled mechanic or engineer chargeable with knowledge of the prior art, which has just been reviewed, at the time of the Fulton inventions. The patents in suit, therefore, are invalid because they fail to meet the test of non-obviousness.

 There is nothing essentially decorative or ornamental about the design of the Fulton playpen as demonstrated above. The design is that of a simple rectangular enclosure resulting from the two part floor of the playpen and the two part tubular aluminum upper frame supported by two pairs of legs and two pairs of brace bars and enclosed with nylon mesh. Thus, the court also finds and concludes that the design patent is invalid for an additional reason, to wit, it is not ornamental but dictated by the mechanical and functional requirements of the utility patent. Hygenic Specialties Co. v. H. G. Salzman, Inc., 302 F.2d 614 (2d Cir. 1962); Bercy Industries, Inc. v. Mechanical Mirror Works, Inc., supra.

*Infringement*

 Although the finding of invalidity of the patents in suit should dispose of the case, it is deemed "approved procedure" to proceed to the question of infringement, assuming validity. Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., 372 F.2d 263, 265 (2d Cir. 1967). On the issue of infringement with respect to the utility patent, the court finds and concludes that defendants' claims of non-infringment, i. e., that there are differences, cited supra, between the utility patent in suit and the accused playpens, cannot be sustained. The differences are insignificant. These slight variations do not save defendants from the charge of infringement. Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

 The design patent is also infringed by the two accused structures. It seems plain, as the rule requires, that in the eye of the ordinary observer, giving such attention as a purchaser usually gives, the design of the Fulton structure and the design of each of the accused structures are substantially the same. The resemblance is such as to deceive the observer, inducing him to purchase one supposing it to be the other. Gorham Mfg. Co. v. White, 14 Wall (81 U.S.) 511, 528, 20 L.Ed. 731 (1872). Defendants claim that there are differences, cited supra, in the designs. Again, these differences are not sufficient to avoid infringement of the design patent. The Second Circuit's ruling in International Silver Co. v. Pomerantz, 271 F.2d 69, 72 (2d Cir. 1959) is applicable here:

"* * * It is true that there are slight differences in the accused's design * * * But clearly these slight

differences in ornamentation are too slight under the applicable test [Gorham] to make the unitary designs distinguishable in view of the close similarity of the major features of the design * * * "

The court having found that the patents in suit, although infringed by defendants, are invalid for failure to meet the test of non-obviousness, the complaint must be dismissed and costs of the action awarded to defendants.

## APPENDIX A

FIG.1.

## APPENDIX B

### CLAIM 1

A. "A folding playyard comprising a foldable upper frame,

B. "two legs

C. "pivotally connected to said upper frame at each side thereof to support said upper frame when opened, the two legs at one side of the frame being aligned, respectively, with the two legs at the other side of the frame

D. "and aligned legs having a common pivotal axis,

E. "a pair of bars, each of which is rigidly connected at its opposite ends to two aligned legs and each of which extends parallel to said common axis,

F. "a floor, said floor comprising two sections, each of which is rigid,

G. "and a rigid supporting member secured to each floor section beneath the same,

H. "each of said supporting members being pivoted at its outer end to one of said bars for pivotal movement about an axis parallel to said common axis,

I. "and said supporting members being hingedly connected together at their inner ends to hinge about an axis parallel to said common axis to fold said floor sections upwardly when said legs are moved toward one another."

## CLAIM 3

A. "A folding playyard comprising two U-shaped frame members disposed to have their ends confronting,

B. "two legs

C. "pivotally connected at their upper ends to each of said frame members at the adjacent ends of said frame members, respectively, one leg at each side of each frame member, the two legs at the same side of the two frame members being aligned, respectively, with the two legs at the opposite side of the two frame members

D. "and pivoting about parallel axes,

E. "a bar extending in the direction of said axes rigidly connecting each pair of aligned legs near the lower ends of the legs,

F. "a floor comprising two sections, each of which is rigid,

G. "a rigid supporting member secured to each floor section beneath the same,

H. "each supporting member being pivoted at its outer end to one of said bars for pivotal movement about an axis parallel to said axes,

I. "the two supporting members being hingedly connected together at their inner ends to pivot about an axis parallel to the pivotal axes of said legs to fold said floor sections when one pair of aligned legs is pivoted toward the other pair of aligned legs,

J. "and a flexible skirt enclosing the playyard and suspended at its upper end from said frame members and fastened at its lower end to said floor sections."

## CLAIM 4

K. "A folding playyard as claimed in claim 3 in which the hinge axis of said supporting members lies and moves in a vertical plane between the pivotal axes of said legs."

## CLAIM 6

L. "A folding playyard as claimed in claim 3 in which there is a brace for supporting each frame member from at least one of the legs that is connected to that frame member, each brace being supported from its leg at a point between the associated frame member and the associated floor section, and each brace supporting its associated frame member at a point spaced from the point of pivotal connection of the associated leg with the associated frame member."

## CLAIM 10

A. "A folding playyard comprising a pair of rigid, generally U-shaped frame members disposed with the ends of one member adjacent the ends of the other member, said frame members together constituting a folding top-bar for the playyard,

B. "two pairs of legs, the two legs of each pair being disposed at opposite sides, respectively, of the folding top-bar

C. "and being pivotally connected at their upper ends thereto for pivotal movement about

D. "a common axis,

L. "a brace for connecting at least one leg of each pair with the adjacent side of one frame member at a point remote from the point of pivotal connection of said one leg and said one frame member to support said one frame member when the playyard is unfolded,

M. "the legs at the same side of the folding top-bar pivoting toward one another in folding the playyard and pivoting away from one another in unfolding the playyard and diverging downwardly from one another from top to bottom when the playyard is unfolded,

E. "a bar rigid with each pair of legs adjacent the lower ends of the legs

and extending parallel to said common axis,

F. "a floor comprising two sections only, each of which is rigid,

H. "the two sections of the floor being pivotally mounted directly on said bars at mutually remote points for pivotal movement about axes parallel to said common axis,

I. "means pivotally connecting the two floor sections together at mutually closer points to pivot about an axis parallel to said common axis to fold upwardly upon folding of the playyard and to unfold when the pairs of legs are pivoted away from one another,

G. "means for supporting said floor sections in horizontal position when unfolded,

J. "and a flexible skirt connected at its upper end to said top bar around the perimeter thereof to depend therefrom and to constitute an enclosure for the playyard when the playyard is unfolded."

### CLAIM 11

N. "A playyard as claimed in Claim 10 wherein said braces constitute the sole means for supporting the top bar from the legs when the playyard is unfolded,

O. "each frame member is foldable independently of the other frame member,

P. "and means is provided for fastening said skirt around said floor at its bottom."

### CLAIM 13

A. "A folding playyard comprising an approximately rectangular frame which constitutes a folding top bar for the playyard and which is formed in two sections pivotally connected to fold to be parallel to one another,

B. "two pairs of legs, the two legs of each pair being disposed at opposite sides, respectively, of the folding top bar

C. "and being pivotally connected at their upper ends thereto for pivotal movement about

D. "a common axis,

M. "the legs at the same side of the folding top bar pivoting toward one another in folding the playyard and pivoting away from one another in unfolding the playyard and diverging downwardly from one another from top to bottom when the playyard is unfolded,

L. "a brace for connecting at least one leg of each pair with the adjacent side of the associated section of the top bar at a point remote from the point of pivotal connection of said one leg and said associated section, when the playyard is unfolded, thereby to support said associated section in its unfolded position,

N. "said braces constituting the sole means for supporting the top bar when the playyard is unfolded,

O. "each section of the top bar being foldable independently of the other section,

F. "a floor comprising two sections only, each of which is rigid,

E. "a bar rigid with each pair of legs adjacent the lower ends of the legs and extending parallel to said common axis,

H. "means hingedly connecting the two floor sections adjacent their mutually remote ends, respectively, with said bars, respectively, for pivotal movement about axes parallel to said common axis, each of said bars being disposed so that its associated floor section rests directly thereon,

I. "means hingedly connecting the two floor sections together at their adjacent ends for pivotal movement about an axis also parallel to said common axis to fold upwardly upon folding of the playyard and to unfold when the pairs of legs are pivoted away from one another,

G. "means for holding said floor sections horizontal when unfolded,

J. "and a flexible foraminate skirt connected at its upper end to said top bar around the perimeter thereof to depend therefrom and attached at its bottom around the perimeter of said floor to constitute an enclosure for said playyard when the playyard is unfolded."

# United States Patent Office

Des. 186,358
Patented Oct. 20, 1959

186,358

**BABY'S PLAY-YARD**

James F. Fulton, Center Line, Mich., assignor to Trimble, Inc., Rochester, N.Y., a corporation of New York

Application January 16, 1958, Serial No. 49,274

Term of patent 14 years

(Cl. D5—5)

*Fig.1.*

Des. 186,358

*Fig.2.*

Des. 186,358

*Fig.3.*

FIG. 4.

APPENDIX D

# folds with pad and toys inside

With a new concept of styling, design and materials, Trimble has made the play yard a thing of beauty and a joy for Mother! Exceptionally attractive to the eye, a cinch to fold and easy to carry.

- PAD AND TOYS CAN STAY INSIDE WHEN IT'S FOLDED.
- LIGHT YET STURDY, WITH ALUMINUM FRAME AND LEGS AND STRONG NYLON NET SIDES.
- FASHION STYLED—IN ATTRACTIVE AQUA VITALON® FABRIC PARTS.

*A REAL EYE-CATCHER FOR CHRISTMAS SELLING!*

**ORDER NOW! MODEL NO. KY 115.**
**RETAIL PRICE, $39.50**

APPENDIX E

J. GABRIEL.
CHILD'S COOP.
APPLICATION FILED JUNE 29, 1921.

1,429,335.

Patented Sept. 19, 1922.

Fig. 1.

Fig. 2.

Inventor

John Gabriel

By Shepherd Campbell

Attorneys

APPENDIX F

E. S. KOLB.
CRIB.
APPLICATION FILED MAR. 25, 1915.

1,158,507.

Patented Nov. 2, 1915.
2 SHEETS—SHEET 1.

FIG.1.